470 So.2d 169 (1985)
The STATE of Louisiana, Plaintiff-Appellant,
v.
JOINT COMMISSION ON ACCREDITATION OF HOSPITALS, INC., Aetna Casualty & Surety Co., Inc., and St. Paul Fire & Marine Insurance Company, Defendants-Appellees.
No. 16900-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1985.
*170 Hudson, Potts & Bernstein by Jesse D. McDonald, Monroe, for plaintiff-appellant.
Provosty, Sadler & Delaunay, Alexandria, for defendant-appellee, St. Paul Fire & Marine Ins. Co.
Theus, Grisham, Davis & Leigh by Ronald L. Davis, Jr., P.C., Monroe, for Joint Com'n on Accreditation of Hospitals, Inc. and Aetna Cas. & Sur. Co.
Before MARVIN, SEXTON and LINDSAY, JJ.
SEXTON, Judge.
This litigation arises as the result of the illness and/or death of certain renal patients at E.A. Conway Memorial Hospital. The harm to these patients was caused by the presence of excessive quantities of aluminum in the water used for their dialysis. The State of Louisiana subsequently settled with the injured patients or their survivors, obtained releases and became subrogated to the rights of those patients. The state then brought suit for contribution as a joint tortfeasor from the Joint Commission on Accreditation of Hospitals, Inc. (JCAH), who surveyed and accredited the hospital on March 27 and 28, 1980; its liability insurer, Aetna Insurance Company; and its excess liability insurer, St. Paul Fire & Marine. JCAH and its insurers in turn filed a third party demand against Culligan, Inc., the manufacturer of the water purification system and Livingston Water Conditioner, Inc. (Livingston), installer and servicer of the system. Prior to trial, the third party demands of JCAH against Culligan and Livingston were severed from the main demand. After a trial, judgment was rendered dismissing the State's claims. This appeal followed. We affirm.

*171 Factual Background

One morning in early March, 1981, five of the eight patients receiving dialysis at E.A. Conway Memorial Hospital began having speech disturbances, seizures and difficulty walking, symptoms of a potentially fatal condition called dialysis encephalopathy or dialysis dementia. The dialysis unit was closed on March 18, 1981, and the patients transferred to another local dialysis facility. Investigators from the Center for Disease Control (CDC) in Phoenix, Arizona were then summoned by the doctors. In order to fully understand the findings of the investigators, some explanation of the dialysis process and the water purification system is required.
When being dialyzed, the patient's blood is exposed to a semi-permeable membrane. On the other side of this membrane is a substance called dialysate solution. This solution is composed of water and dialysate concentrate, which is a fluid composed of electrolytes such as sodium, potassium and chloride. As the blood and dialysate solution oppose each other through the membrane, harmful substances present in high quantities in the blood are transported to the dialysate solution, and conversely, the elements from the electrolyte solution lacking in the patient's blood pass through the membrane to replete and enrich the blood. In this process, then, the substances desirable for repletion of the blood are contained in the dialysate, as the substances will travel from the fluid where they exist in the highest concentration to the fluid containing the lowest concentration of these substances. Therefore, if a harmful or undesirable substance exists in a large concentration in either the dialysate concentrate or the water with which the concentrate is diluted, the harmful substance will be conducted across the membrane and into the patient's blood serum.
The purity of the water used in this process is supposedly insured by a water purification system. In the system existing at E.A. Conway, water entered the unit and passed through a charcoal filter bed, through a water softener, then went to a reverse osmosis (RO) unit which removed impurities. From the RO unit, the pure water was conducted to outside storage tanks and pumped as needed back into the system through deionization (DI) tanks, which acted as a polisher. From this point, the water traveled through a heater, and then proceeded to the individual dialysis machines.
The water purification system contained an alarm system called a resistivity or conductivity meter designed to indicate when the water contained certain impurities. The presence in the water of certain chemicals, electrolytes, would cause the water to conduct electricity and activate a red light on the discharge side of the DI tanks. Normally, when the water was pure, a green light was illumined. This warning device could be calibrated as dictated by the system.
At E.A. Conway, it was the duty of the nurses at the renal unit to monitor this red/green light, and notify either the maintenance personnel or the unit directors when the red light was activated so that appropriate action by way of changing the DI tanks could be instituted to restore the purity of the water used for dialyzing patients.
The investigation of the renal unit water purification system by personnel from the CDC revealed that: (1) The resistivity meter was malfunctioning as it was constantly illumined green; (2) The DI tanks were totally exhausted. The tanks normally should have been exhausted in three days when the RO unit was not functioning properly. These DI tanks had been changed only two times since the unit's opening in 1976; (3) The RO unit, when it functioned, was only working at a 63% efficiency rate in regard to removing chemical contaminants from the water. The investigators were told by hospital personnel that because of water pressure problems, the RO tanks burned out frequently; (4) From mid-1979 through March 16, 1981, the RO unit had been by-passed by maintenance personnel. The RO unit was reconnected to the system on March 16, 1981. *172 Consequently, during the time period in question, the RO unit had only been in functional operational condition for two days before the dialysis unit was closed; and (5) the charcoal filter in the treatment equipment was totally nonfunctional and exhausted.
A further environmental complication was discovered by the CDC investigators. On February 4, 1981, the city of Monroe decided to do routine and preventive maintenance on its new water treatment facility. To facilitate this maintenance work, all of the water in Monroe was sent to an old treatment plant. At this point, the city water contained aluminum in the ratio of 1,000 to 1,500 parts per billion, a figure 100 to 150 times higher than the normal level of aluminum allowed in water used for dialysis purposes. Under normal circumstances, the tap water of the city of Monroe contained 400 parts per billion aluminum, 40 times greater than normal allowable limits.
After consideration of the environmental data, and the medical records of the patients dialyzed at E.A. Conway, Dr. Jeral Ahtone of the CDC opined that these patients were suffering from dialysis encephalopathy arising from aluminum intoxication of their bodies. He found that sufficient levels of aluminum, introduced into their systems by the dialysis process, had been deposited in their brains to cause these neurological symptoms. Dr. Ahtone specifically concluded that the cause of the aluminum getting into the patients' bodies was the malfunction of the water purification equipment, including the by-passing of the RO unit; the failure to change the DI tanks when exhausted; and the malfunctioning of the resistivity meter. The coexistence of all of these factors, in Dr. Ahtone's opinion, allowed the patients to be dialyzed with unpurified city water, which under normal circumstances was 40 times higher in aluminum content than allowable limits. As to the period of time from February 4, 1981 until the unit's closing on March 18, 1981, the doctor testified that it was more accurate to say that the patients were poisoned with aluminum.

The Instant Litigation
The State of Louisiana in its own right and as subrogee of the rights of the injured patients brought this suit against JCAH as the result of a contract to survey E.A. Conway Memorial Hospital. During this survey, a team of four members evaluated the hospital, including the renal unit, against certain standards developed by JCAH. Finding "substantial compliance" with these standards, the JCAH survey team awarded a one year accreditation to E.A. Conway. In general, this accreditation by JCAH of the hospital and renal unit, and more particularly, the failure to discover and alert the hospital personnel of the alarming circumstances extant in the renal unit, forms the basis of the State's claim against JCAH.
The State delineates three causes of action against JCAH: (1) a cause of action in the State's own right as a contracting party with JCAH for damages against JCAH based on a simple breach of contract; (2) a cause of action as the subrogee of the nearly seventy injured dialysis patients sounding both in tort, for the negligent breach of the duty owed by JCAH to the patients, and (3) in contract, predicated on the contention that the dialysis patients were third party beneficiaries of the contract between the State and JCAH.
In order to facilitate a discussion of these issues, a brief recapitulation of the purposes, standards, and survey and accreditation processes of JCAH follow. JCAH is a private, nonprofit corporation. Its member groups are the American Medical Association, the American Hospital Association, the American College of Physicians, and the American Dental Association. A JCAH survey is strictly voluntary. JCAH has no authority, by contract or otherwise, to require any action by the surveyed hospital. No hospital is required to accept or implement a JCAH recommendation, and only substantial compliance with the standards is needed for accreditation. The 1980 edition of JCAH's accreditation manual for *173 hospital describes the role of JCAH as follows:
The JCAH assumes the role of evaluator, consultant, and educator. Its function is to help hospitals identify both their strengths and weaknesses in regard to JCAH's standards, and to provide guidelines for improvement through consultation and education. A request by a hospital for a survey signifies a professionally motivated, voluntary commitment to self evaluation and self improvement.
According to Roy Bostick, Conway's administrator, and other hospital administrators who testified, accreditation of a hospital by JCAH is of significant import. Besides signifying acceptance in the health care field, accreditation "deemed status" by JCAH entitles the hospital to participate in the Medicare program. Teaching institutions also seek accreditation by JCAH in some instances. Accreditation by JCAH is the primary means by which the institution is certified as a teaching institution. At the time pertinent to this litigation, JCAH surveys were conducted every one or two years, depending on the degree of compliance. Following the survey in question, E.A. Conway was awarded a one-year accreditation indicating a greater range of noncompliance with JCAH standards than would be reflected by a two year accreditation.
The manual describes JCAH standards as "having four characteristics: they are valid, that is, they relate to the quality of care or services provided; they are optimal, reflecting the highest state of the art; they are achievable, meaning that compliance with them has been demonstrated in an existing facility; and compliance with them is measureable." Dr. John Affeldt, president of JCAH explained that the standards are designed to apply to all types of hospitals, large or small. They are drafted for long term application and are usually general rather than specific. As explained by Dr. Affeldt, JCAH avoids standards which are medically prescriptive.
According to the manual, the purpose of the accreditation survey is to determine the extent of compliance with JCAH standards. The manual states that accreditation need not require one hundred percent compliance with every item in the standards that is applicable to a given hospital. Accreditation decisions will be based on a careful and reasonable assessment of each individual case. The extent of compliance with each item of the standards will be assessed in at least one of the following ways: (1) statements from authorized and responsible hospital personnel; (2) documentary evidence or certification of compliance provided by the hospital; (3) answers to detailed questions concerning the implementation of an item, or examples of its implementation, that will enable a judgment of compliance to be made; (4) on-site observation by surveyors.
Of particular pertinence to this litigation is the JCAH standard relative to water used for dialysis purposes in renal units. This standard provides that "water used for dialysis purposes shall be analyzed periodically and treated as necessary, in order to assure that it is biologically and chemically compatible with acceptable dialysis techniques. Test results shall be recorded and reported to the unit medical director and head nurse."
E.A. Conway Hospital did not periodically chemically test the water used in the dialysis process. Therefore, the hospital was not in compliance with the JCAH standard relative to water use for dialysis purposes in renal units when the survey occurred.

The Contractual Claim
The hospital administrator testified that on September 24, 1979, he received in the mail from JCAH a letter advising the hospital that it was "due for survey" in 1980. The letter enclosed an application form and advised that an application fee of $150 must accompany the application. In response to the letter, the hospital administrator forwarded the completed application and the hospital's check for $150 to JCAH. Shortly thereafter, the hospital received a copy of JCAH's 1980 accreditation manual *174 for hospitals and copies of the 1979 Hospital Survey Profile (HSP), which was to be completed by hospital personnel prior to the survey. Thereafter, on February 14, 1980, the hospital administrator received a letter from JCAH dated January 30, 1980 indicating that the survey would take place on March 27 and 28, 1980. The letter also informed the hospital that four persons would comprise the survey team and that at the conclusion of the survey a summation conference would be held at which time the surveyors would present their findings. The letter stated that the summation conference was an important opportunity for the hospital to discuss and clarify comments and recommendations made by the surveyors. On February 24, 1980, the hospital received a letter from JCAH enclosing an advance bill for the survey services to be performed and requesting payment within ten days. Nine days later, E.A. Conway issued a check for $4,800 payable to JCAH. The survey was conducted as scheduled on March 27 and 28, 1980.
Generally, the State claims that it is entitled to damages for JCAH's alleged defective performance of the contract to survey. More specifically, the State complains that JCAH failed to perform the contract to survey in good faith, and in a skillful and workmanlike manner. The State avers that JCAH breached the contract when the surveyors failed to discern the unsafe operational conditions of the renal unit and advise the hospital personnel, and that the surveyors failed to utilize their own surveying procedures to measure compliance with their promulgated standards. The state also argues that JCAH breached certain incidental obligations implied in the contract to survey, viz., to develop their standards and properly train their surveyors.
This claim must be evaluated within the following codal framework:[1]
Art. 1983. Law for the parties; performance in good faith
Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law. Contracts must be performed in good faith.
Art. 1903. Extent of implied incidental obligations
The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect.
Art. 1994. Obligor liable for failure to perform
An obligor is liable for the damages caused by his failure to perform a conventional obligation.
A failure to perform results from nonperformance, defective performance, or delay in performance.
Dr. Byron Buff, a physician member of the survey team, examined the renal unit and nine other departments of the hospital during the two day survey. Although a medical doctor, Dr. Buff is not a specialist in nephrology.
One of the grounds asserted by the State in support of its claim of lack of good faith performance of the contract was Dr. Buff's failure to have his survey checklist with him when he surveyed the renal unit. Dr. Buff, however, testified that he did not carry his checklist with him because interviewees sometimes focused their attention on the checklist; therefore, he had established the procedure of making notes as he was surveying a special care unit and filling out the appropriate checklist at a later time.
*175 Another State complaint is that Dr. Buff failed to use one of the four enumerated JCAH criterion for measuring compliance with their standards. Dr. Buff testified that he had no independent recollection of the survey of E.A. Conway's renal unit. However, he testified as to his typical procedure when surveying a renal unit. According to his testimony, one of the questions he routinely asked the medical director or nurse being interviewed is if the water was periodically tested for bacteria and for chemicals, and if the reports were being called to the attention of the unit director. On some occasions, approximately half of the time in the doctor's estimation, he examined the unit's lab reports. The doctor stated that he relied upon the unit medical directors to determine what biological or chemical testing should be done to the water. While candidly conceding that he surveyed some 100 hospitals a year on the average and that he had no specific recollection of this particular survey, Dr. Buff testified quite positively that he was satisfied that he asked these important questions during the survey of this renal unit. Dr. Buff specifically stated that upon hearing head nurse Carol Dufour's testimony that he had asked her about bacteriological testing, he was made "99.999%" certain that he had asked about both bacteriological and chemical testing. Thus, Dr. Buff unequivocally testified that he was confident that he made inquiries concerning both biological and chemical testing because if he made the biological inquiry, he always also inquired concerning chemical testing.
Nurse Dufour testified that there was never any chemical testing of the water used in the dialysis process, and that the chemical testing was done on the dialysate concentrate only. She testified that Dr. Buff's survey of the renal unit lasted approximately 15 minutes. According to her testimony, he asked to see the lab reports pertaining to testing of bacteria in the water, and dialysate electrolytes, a chemical test of the dialysate concentrate, not the water. From this witness, it was elicited on cross-examination that one of the lab reports submitted to Dr. Buff was labeled "water for dialysis" and indicated tests for certain chemicals.
The trial judge resolved any variances in testimony in favor of Dr. Buff and JCAH and found in specific terms that "the testimony of Nurses Robinson and Dufour, particularly Carol Dufour, showed that Dr. Buff, the surveyor sent by JCAH to accredit Conway, did in fact check to see that periodic biological and chemical testing of the water was being carried out, and that these tests were being reported to the unit medical director."
The trial judge was therefore satisfied that Dr. Buff had asked pertinent questions as to both chemical and biological testing and reasonably concluded that Conway was in substantial compliance with the JCAH standard relative to water for dialysis purposes. We find no manifest error in his conclusion in this regard and we are therefore bound by that finding. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
Having determined then that Dr. Buff reasonably inferred that chemical testing of the water was being performed because of the indications of the head nurse and the lab reports, we must now decide whether this action discharged any contractual obligations owed from JCAH to E.A. Conway. We answer in the affirmative.
Simply stated, JCAH undertook to survey the hospital and measure compliance with its standards in one of four enumerated ways. Finding such compliance, accreditation was awarded. On the other hand, the State agreed to pay for this surveying service, with the ultimate goal in view of achieving valuable accredited status. JCAH did not undertake to guarantee the safe operation of the hospital or renal units. Neither did they agree to underwrite the competency of the two qualified nephrologists in charge of the hospital's dialysis unit.
We conclude, therefore, that Dr. Buff's action in assessing the level of compliance by obtaining statements from an *176 authorized hospital employee, the head nurse, discharged JCAH's obligation to measure compliance with its standards in the manner set forth in its manual. The manner of performance of the contract in this instance was not defective nor was a lack of good faith in the execution of the agreement demonstrated. No further obligations which may have been implied in this agreement were breached. Consequently, the State is not entitled to recover damages on its contractual claim. This argument lacks merit.

The Tort Claim
The State, as subrogee of the rights of the injured patients, argues that it is entitled to recover because of the tortious breach of the contract between the State (Conway) and JCAH.
As suggested by JCAH, the trial court analyzed the subrogated tort claim within the framework of the Restatement of Torts (Second) Section 324(A). Finding an absence of the requisite conditions for the satisfaction of the provisions of the Restatement, the trial court rejected the State's claim. This Court has been cited no authority holding that this common law principle has been adopted in Louisiana tort law, and in our civilian jurisdiction, we are constrained to analyze this claim under the provisions of LSA-C.C. Art. 2315 and its interpretive jurisprudence.
Certain cases which have been cited by the defendant are of limited guidance to the Court in the definition of the scope of duty owed by JCAH.
In Coppage v. Gamble, 297 So.2d 468 (La.App. 2d Cir.1974), suit was instituted against a physician, a hospital, the State Department of Hospitals, and the State Board of Medical Examiners. Plaintiff alleged that the State Board of Medical Examiners was liable to him for damages because it had issued a license to practice medicine to the doctor who operated on him. This Court in upholding the sustaining of an exception of no cause of action noted that the mere issuance of a license by a licensing authority does not render the licensing authority liable for the offenses of the licensee.
In Guillot v. State of Louisiana, 364 So.2d 254 (La.App. 3d Cir.1978), writ denied, 366 So.2d 576 (La.1979), suit was brought for wrongful death against the State. Plaintiff claimed that the Department of Public Safety should have seized the license of the adverse driver which had been revoked because of driving while intoxicated. The Court refused to find liability on the part of the State, concluding that any duty imposed on the state police to pick up a revoked driver's license did not include within its scope the protection of third persons from injury from the revoked driver's driving.
In Frank v. Pitre, 353 So.2d 1293 (La. 1977), plaintiff, a policeman, was shot by a prisoner who had been released by the sheriff on a week-end pass. The suit against the sheriff was dismissed. The Court held that whatever the theoretical basis for liability was called, the claimed cause of the injury, the release of a prisoner, did not sufficiently contribute to the injury to create liability in the defendant. In a concurring opinion, then Justice Tate stated:
"For a defendant's violation of a duty to be a legal cause of an injury, his violation must not only be a cause in fact (i.e. a substantial factor contributing to) the injury, but the duty violated must also have included within its purpose the prevention of the risk encountered by the plaintiff to his injury." (Citations omitted)
In support of its claim, the State relies upon Foy v. Ed Taussig, Inc., 220 So.2d 229 (La.App. 3rd Cir.1969), and Ned v. Hertz Corporation, 356 So.2d 1074 (La. App. 4th Cir.1978). Both of these cases involve the suit by a third person against a defendant for negligent repair of a vehicle. Foy reiterates the general rule that recovery may be had against a repairman for personal injuries sustained after the making of repairs to a motor vehicle, if the evidence establishes that the repairman *177 was negligent in making repairs, that there was a causal relationship between the negligent repair work and the subsequent accident, and that the negligence of the repairman was a proximate cause of the accident.
We find that defendant's jurisprudence is more nearly appropriate than these cases and that plaintiff's authority is inapposite to the instant situation. Here, there was no specific contractual obligation to repair the renal unit. This contract was merely a contract with the broad purpose to survey and measure compliance with the JCAH standards. The duty to survey did not include within its scope the protection of hospital patients against injury from the inattention and possible malpractice of certain hospital personnel and the malfunctioning of certain equipment. The responsibility for the safe operation of the dialysis unit rested mainly with the appropriate hospital personnel. Their inattention to the quality of water used in dialysis and the malfunctioning of the water purification equipment were the primary forces which resulted in the patients' harm. For liability to attach, the duty which JCAH owed to the hospital must have included within its scope the prevention of the risk encountered by the dialysis patients to their eventual injury. It simply does not. There is clearly no ease of association between the harm incurred by these patients and the failure to discover and report to the unit directors, the parties primarily responsible, any problems with the water purity.
Simply stated, plaintiff has failed to demonstrate that under Louisiana's classic duty/risk tort analysis mandated by Dixie Drive-It-Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Hill v. Lundin & Assoc., Inc., 260 La. 542, 256 So.2d 620 (1972), and their progeny, that the defendant has breached a duty which encompassed the risk which caused the injury to Conway's patients. This argument is without merit.

Stipulation Pour Autrui
In the State's final argument, it again assumes the posture of the subrogee of the rights of the injured dialysis patients. Here the State asserts that the trial court erred in finding that the patients were not the beneficiaries of the stipulation pour autrui of the contract between the State (Conway) and JCAH.
The linchpin of the State's contention is contained in the corporate purposes of JCAH stated in its certificate of incorporation and its accreditation manual. The manual states that a corporate purpose is "to conduct survey and accreditation programs that will encourage members of the health professions, hospitals, and other health-related facilities and services voluntarily... to promote high quality of care in all aspects in order to give patients the optimal benefits that medical science has to offer...." (Emphasis ours.) Plaintiff specifically relies on this statement to support its argument that a primary JCAH purpose was to assure patients the optimal benefits that medical science has to offer.
Stipulations in favor of third parties are specifically authorized under LSA-Civil Code Articles 1978 and 1985.[2] The factors to be considered in deciding whether an advantage for a third person has been provided by contract between others are: (1) the existence of a legal relationship between the promisee and the third person involving an obligation owed by the promisee to the beneficiary which performance of the promise will discharge; and (2) the existence of a factual relationship between the promisee and a third person, where (a) there is a possibility of future liability either personal or real on the part of the promisee to the beneficiary against which performance of the promisor will protect the former, (b) which secures an advantage for the third person may beneficially affect the promisee in a material way, and (c) where there are ties of kinship or other *178 circumstances indicating that a benefit by way of gratuity was intended. Andrepont v. Acadia Drilling Co., 255 La. 347, 231 So.2d 347 (1969); see also Smith, Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui, 11 Tul.L.Rev. 18, 58 (1936);
Additionally, the benefit in favor of the third party may not be merely incidental to the agreement in question. Wagner and Truax Company v. Barnett Enterprises, 447 So.2d 1255 (La.App. 4th Cir. 1984); English v. National Collegiate Athletic Association, 439 So.2d 1218 (La.App. 4th Cir.1983); HMC Management Corporation v. New Orleans Basketball Club, 375 So.2d 700 (La.App. 4th Cir.1979), writ denied, 378 So.2d 1384; 379 So.2d 11 (La. 1980).
We conclude that it was never a condition or consideration of the contract between Conway and JCAH to confer a benefit or advantage to the hospital patients. A close reading of the quoted JCAH statement of purposes reveals that the purpose of the JCAH survey was to foster self-improvement by the hospital. Any benefit in favor of the hospital patients which resulted from the contractual agreement was merely incidental. JCAH did not contract to monitor, regulate or supervise the standard of Conway's patient care. In fact, JCAH had no authority to mandate compliance with accepted medical standards or to require remedial action. To receive a passing grade, it was not required that the hospital show that it rendered optimal patient care. Only substantial compliance with JCAH's standards was necessary to achieve accreditation. This argument is without merit.
Thus, in summary, we hold that under the facts of this case, JCAH did not render defective performance of their contractual obligation to survey the hospital. The scope of the duty owed by JCAH did not include within its ambit the prevention of the risk of injury to the dialysis patients; and the contract contained no stipulation pour autrui, as any benefit to E.A. Conway's patients conferred by virtue of this contract was merely incidental.
Accordingly, the judgment of the trial court is affirmed.
Costs of this appeal are assessed against plaintiff, State of Louisiana, insofar as such costs may be taxed against the State.
AFFIRMED.
NOTES
[1] LSA-C.C. Arts. 1983 and 1994, as amended by Act 331 of 1984, effective January 1, 1985 reproduce the substance of former LSA-C.C. Arts. 1901, 1930 & 1931. Since they affect no substantive change in the law, they may be applied retroactively.

LSA-C.C. Art. 1903 was also amended by Act 331 of 1984 effective January 1, 1985. The official revision comment indicates that the new article, Art. 2054 changes the law, making the rule of LSA-C.C. Art. 1903 (1870) a rule of interpretation rather than one of substantive law. Hence, the amendment was substantive and not considered. LSA-C.C. Art. 8, LSA-Const. Art. 1, § 23; Fabiano v. Bryan, 438 So.2d 719 (La.App. 2d Cir.1983).
[2] The substantive of these articles, contained in the 1984 obligations revisions were taken from LSA-C.C. Arts. 1890 and 1902 (1870). The official comments indicate that the law was not changed.