PAUL A. BONIN, Judge.
1 ,This is a wrongful death and survival action arising out of the death of Gordon Serou, Sr., at a New Orleans hospital in the aftermath of Hurricane Katrina. The plaintiffs are Mr. Serou’s surviving spouse (Judy Serou) and their three adult children (Gordon Serou, Jr.; Stephen Serou; and Dr. Michael Serou). The three principal defendants are the hospital, Specialty Hospital of New Orleans, Inc. (“SHONO”); the hospital’s lessor, Touro Infirmary (“Touro”); and the company that contracted to provide emergency generator services to Touro, Aggreko, LLC (“Aggre-ko”).[1]
Although the plaintiffs’ claims against the trio of defendants are tort (premises liability) claims, the duties on which their tort claims are based arise out of two separate contractual arrangements: (1) the Lease and Services Agreement between Touro and SHONO; and (2) the Hurricane Contingency Plan Agreement (“HCPA”) between Touro and Aggreko.
Under the Lease and Services Agreement, SHONO leased the seventh floor of *1073 Touro’s main hospital building located at 1501 Foucher Street, New Orleans. At that location, SHONO operated a long-term acute care facility beginning in 1998 |2and continuing through the aftermath of Hurricane Katrina. In essence, SHONO operated as a hospital within a hospital. SHONO had its own staff and was responsible for providing the clinical and medical care to its own patients. In the Services Agreement, Touro agreed to provide certain auxiliary services to SHONO’s patients, such as transportation and therapy; however, the agreement expressly provided that “Specialty Hospital is ultimately responsible for all care rendered to Specialty Hospital’s patients by Touro.” The agreement also required that Touro and SHONO cooperate in preparing for disasters.[2]
Under the HCPA, Aggreko agreed to provide certain emergency generator services to Touro. Aggreko’s alleged breach of the HCPA was the basis for the plaintiffs’ claims against it. In response to being joined as a defendant, Aggreko filed a cross claim against Touro for contractual indemnification under the HCPA. Touro, in turn, filed a similar cross claim for indemnification against Aggreko. Before trial, Aggreko and Touro severed and continued their cross claims; and the plaintiffs settled their claims against both SHO-NO and Aggreko.
Following a bench trial, the district court allocated fault 70% to SHONO, 30% to Touro, and 0% to Aggreko. The district court awarded the plaintiffs total damages of $345,000 against Touro — $300,000 for the wrongful death damages (30% of $1,000,000) and $45,000 for the survival damages (30% of $150,000). | ¡¡From this judgment on the plaintiffs’ principal demand, Touro appeals. Having reviewed the record, the evidence therein, and the applicable law, we affirm the district court’s judgment.
While the plaintiffs’ principal demand was under advisement, the district court granted Aggreko’s motion for summary judgment dismissing Touro’s indemnity cross claim against it.[3] Touro concurrently appeals that judgment. Based on the presence of genuine issues of material fact within the record, we reverse the district court’s judgment on Aggreko’s motion.
*1074 FACTUAL BACKGROUND
The facts of this case are complex and best understood if divided into three sections: (i) -Mr. Serou’s medical history, (ii) the events at Touro, and (iii) the events at SHONO.

(1) Mr. Serou’s Medical History

In the early 1980’s, Mr. Serou was diagnosed with Parkinson’s disease. In the late 1980’s, he suffered a heart attack. His family cared for him at home until 2003. In 2008, he broke his hip, underwent hip replacement surgery, and permanently lost his ability to walk. From 2003 to 2005, he was a resident at Woldenberg Nursing Home where he received hospice care.[4]
|4On July 26, 2005, Mr. Serou was admitted to Touro for treatment of decubitus ulcers (bedsores) on his left hip and buttock. On August 3, 2005, Mr. Serou was discharged from Touro and admitted to SHONO’s long-term acute care facility, located on the seventh floor of Touro (also called “Q-7”). On that date, his treating physician, Dr. Jacqueline Langie, prepared the following “physician discharge summary”:
The patient is a 67-year-old male resident of Willow Wood Nursing Home, Woldenberg Village with a diagnosis of Parkinson’s disease, dementia, coronary artery disease, as well as paralysis agi-tans. The patient is usually in very good state of health;[5] however, he began to develop ischial tuberosity bedsores at his residence. He was admitted to try and again [sic] control over his acute wounds and to determine whether or not they were infected deeply so. A bone scan was done to particularly rule out osteomyelitis.... [T]he bone scan was not positive for osteomyelitis and that the infection or any inflammation was only in the soft tissue surrounding the bone. The patient was therefore consulted with wound [care].... and the patient will be discharged ... to be admitted to Specialty Hospital and placed on a special bed [a Clinitron bed][6] so as to facilitate healing and treatment of these wounds. It is noted *1075 that the culture for the patient’s wound was positive for MISA, so he will [be] started ... on appropriate antibiotics ... and needs an IV to deliver ...
From Saturday, August 27, through Tuesday, August 30, Dr. Theodore Borg-man, Jr., an internal medicine doctor, saw Mr. Serou daily because he was covering Dr. Langie’s patient rounds. Although he had no independent recollection |fiof Mr. Serou, Dr. Borgman explained his notes (and absence of notes) in Mr. Serou’s chart as follows:
1) On August 27, he entered an order at the request of a SHONO nurse to consult River Region Hospice; he also noted in the chart that there was “[n]othing else new”;[7]
2) On August 28, he noted that there was nothing new, “barely responsive”;
3) On August 29, he noted that he saw Mr. Serou in the hall because of the hurricane. He explained that the SHONO staff was concerned about glass breaking from the hurricane and moved their patients into the hallway. On that date he also noted “[t]here has been no — delta means change — since yesterday”;
4) On August 30, he saw Mr. Serou for the last time; however, he did not make an entry in the chart;[8] and
5)When he took over the care of Mr. Serou on August 27, Mr. Serou was receiving antibiotics and IV fluids; he made no change in the medications Mr. Serou was receiving during the time he saw him.
As ordered by Dr. Borgman, on August 27, a SHONO nurse contacted River Region Hospice seeking to discharge Mr. Serou to that facility and to reinstitute hospice care. Due to the threat posed by the hurricane, River Region Hospice was not accepting new patients. For this reason, Mr. Serou was still a patient of SHO-NO when Hurricane Katrina made landfall on Monday, August 29.
On Sunday, August 28, the Mayor of the City of New Orleans ordered a mandatory evacuation of the city, which excluded hospital employees and their Rpatients. Both Touro and SHONO activated their emergency disaster plans and independently decided to shelter-in-place.

(2) The Events At Touro

On August 28, Touro went into “lock down” mode and required that all visitors exit the hospital. According to Dr. Kevin Jordan, Touro’s Director of Medical Affairs in August 2005, a SHONO supervisor was present in the facility after Touro went into lock down; however, the SHO- *1076 NO supervisor left shortly thereafter. Leslie Hirsch, who started as Touro’s Chief Executive Officer on the Monday before Hurricane Katrina, August 22, and who had never experienced a hurricane, was chief in command. According to Mr. Hirsch, no SHONO representative participated in the leadership meetings that he conducted on the eve of the hurricane to discuss hurricane preparations.
Ultimately, Touro suffered the loss of both its water supply, which the New Orleans Sewerage and Water Board (“S & WB”) provided, and its electrical supply, which Entergy provided.[9] Although Touro had multiple permanent in-house backup generators that it maintained and tested regularly, its backup generators were not designed to power its air condition chiller units. At the time of Hurricane Katrina, Touro had a separate system for providing power to its chiller units referred to as Touro’s “Emergency Chilled Water Loop” plan.[10]
|7The “Emergency Chilled Water Loop” plan was designed to provide air conditioning to a portion of Touro’s main hospital building in the event of a power outage. The portion of the hospital that was to receive emergency air conditioning included only the first three floors, which was where the communication center was located. The seventh floor, where SHONO’s unit was located, was excluded. To provide for the excluded areas, Touro had a separate system, referred to as the “Emergency Spot Cooler Locations” system.
Under the “Emergency Spot Cooler Locations” system, the locations of multiple spot coolers were designated on a map; the purpose of the designated locations was to ensure the spot coolers had emergency backup generator power. Four spot coolers were designated for the seventh floor; two of those spot coolers were designated to be placed in the SHONO unit near the nursing station.[11]
To obtain a backup generator for the emergency chilled water loop and fifty spot coolers for the emergency spot cooler locations, Touro entered into the HCPA with Aggreko. On August 28, Aggreko delivered the spot coolers and the generator. On August 29, the Aggreko generator failed within hours of being put into service. In addition to a backup generator, Touro’s emergency chilled water loop was dependent upon its water supply from the S & WB, which ultimately failed as a result of the breach of the levees.[12] Due to *1077 overheating of the phone switch in its communication center, Touro suffered a communication failure. Its back-up communication system was in-house walkie-talkies, which the SHONO nurses | swere provided. Another form of back-up communication Touro implemented after the hurricane was the use of “floor walkers.”[13] Two of Touro’s internal backup generators also failed apparently due to contaminated fuel that Touro accepted from an unknown military source shortly after the hurricane.[14] However, according to Touro’s witnesses, its generator that provided backup power to all the patient headboards never failed. For multiple reasons, Mr. Hirsh decided to evacuate the entire hospital, including SHONO, on August 30. The evacuation commenced on August 31, but was not fully completed until September 1.

(3) The Events At SHONO

When Hurricane Katrina made landfall, SHONO had sixteen patients admitted to its inpatient facility.[15] Although SHONO had ten staff members assigned to the facility as the activation team, during the day on August 30, all but two of SHONO’s staff members left. Those eight SHONO staff members requested and were granted permission to leave by SHONO’s director of nursing. The two remaining SHONO staff members — Sethany Johnson, a registered nurse, and Jacqueline Stampley, a licensed practical nurse — at all times were responsible for providing nursing care to at least ten patients. Between August 29 and 31, six of the sixteen patients on the SHONO unit, including Mr. Serou and his roommate, died.
IsAt trial, Nurse Johnson testified that she was a SHONO employee and a member of the activation team for the storm. She testified that none of the sixteen patients on the SHONO unit were terminal or expected to die in the next few days following the hurricane. She further testified that, after the power went out, it became “extremely hot” and unbearable on the SHONO unit. They were without air conditioning, open windows, running water, flushing toilets, and telephones. She described the conditions as akin to “living in a third world country.”
Contrary to the testimony of Touro’s witness, Nurse Johnson testified that the only lights on the SHONO unit were at the nursing station, not in the patients’ rooms.[16] She testified that in order to get medical assistance the SHONO nurses waited until the doctors rounded on the SHONO unit. She acknowledged that they had walkie-talkies and that when they *1078 were able to get a line, they were able to summon someone to the unit. She denied knowing about Touro’s “floor walkers.” She also acknowledged that she never inquired if she could move a SHONO patient from the seventh floor to another area of the hospital for any reason.[17] She identified the biggest problem they had on the SHONO unit as the inability to control the ambient temperature. She testified that she did not recall seeing any spot coolers on the SHONO unit, but she acknowledged that she had at least one box fan.
According to Nurse Johnson, after they lost power and air conditioning, the SHO-NO patients began to experience heat-related problems, such as profuse | insweating, elevated body temperatures, and agitation. Although she testified that all the SHONO patients experienced symptoms of heat exhaustion, Nurse Johnson had no specific recall of Mr. Serou. In order to take care of the patients’ heat-related problems, Nurse Johnson testified that the SHONO nurses stripped the patients naked and placed wet clothes on the patients’ head and neck areas.
The SHONO nurses stopped charting on certain patients by August 30. Nurse Johnson explained that they stopped charting because they were attending to life saving measures. The last chart note the SHONO nurses entered on Mr. Serou was a medication administration record note entered on August 30, and vital signs recorded on August 29. On August 31, Mr. Serou died at SHONO. At 5:00 p.m. Dr. Victor Tedesco, IV, declared Mr. Ser-ou dead and wrote in the chart: “Hurricane note Pt. [patient] expired 2° [secondary to] heat.” Shortly thereafter, Nurse Johnson prepared the Consent for Donation of Anatomical Gift form for the Louisiana Organ Procurement Association (“LOPA”) in which she listed the cause of death as “Cardiopulmonary Arrest 2° Hy-perthermia.” [18] Nurse Johnson testified that she completed that form based on information she obtained from Dr. Tedes-co. On Mr. Serou’s death certificate, the cause of death is listed as “pending investigation.” The “provisional anatomical diagnoses” listed in Mr. Serou’s autopsy were: 1. Advanced post-mortem decomposition, 2. Pulmonary congestion; and 3. Post-surgical chest exploration, remote.
PROCEDURAL BACKGROUND
In August 2006, the plaintiffs commenced this suit against Touro, SHONO, In and SHONO’s insurer, Columbia Casualty Company. In their petition, which was amended multiple times, the plaintiffs allege that from August 3, 2005, the date he was transferred from Touro and admitted to SHONO, until August 31, 2005, the date he died, Mr. Serou required the daily use of an IV pump and a Clinitron bed. He also required assistance with eating, bathing, and mobility. The petition further alleges that despite the mandatory evacuation order issued by the mayor, Touro and SHONO failed to evacuate their patients and failed to ensure that they had the proper life-sustaining equipment, staff, and *1079 resources necessary to ensure the safety of their patients in the event of a power failure, flood, or both. The petition still further alleges that according to SHONO’s records, Mr. Serou died as a result of cardiopulmonary arrest due to hyperther-mia.[19]
In response, Touro and SHONO filed exceptions of prematurity asserting that the petition alleged medical malpractice and thus was required to be submitted to a medical review panel.[20] Meanwhile, in September 2007, the Louisiana | ^Supreme Court held that allegations of failure to *1080 provide sufficient emergency power and to have a plan to evacuate were not medical malpractice claims and thus were not required to be submitted to a medical review panel. LaCoste v. Pendleton Methodist Hosp., L.L.C., 07-0008, 07-0016 (La.9/5/07), 966 So.2d 519.
At the November 2007 hearing on the exceptions of prematurity in this case, Touro and SHONO acknowledged that the LaCoste case was controlling; and the district court denied the exceptions.
In June 2009, the plaintiffs amended their petition to add Aggreko as an additional defendant. As noted, the basis for the claims against Aggreko was the HCPA that Touro and Aggreko entered into in June 2005 for emergency generator services. Under that contract, Aggreko was responsible for providing emergency generator power in order to allow the main air conditioner to be operational despite a power outage. The plaintiffs alleged that Aggreko provided one emergency 1 ^generator to Touro; however, the generator stopped functioning within hours of being put into service. The plaintiffs further alleged that the generator was inadequate, faulty, and completely insufficient to satisfy Touro’s needs. The plaintiffs thus allege that Aggreko breached its obligations to Touro and, in turn, to those individuals being treated at the hospital, including Mr. Serou. In response to being named as a defendant, Aggreko filed a cross claim against Touro for indemnification under the HCPA. Touro responded by filing a cross claim against Aggreko seeking the same relief.
In September 2010, the district court granted the motion for partial summary judgment filed by Touro and SHONO and dismissed with prejudice all the plaintiffs’ claims for medical malpractice.[21]
In June 2011, the district court granted SHONO’s motion for partial summary judgment finding no genuine issues of material fact that under the Lease and Services Agreement in effect between Touro and SHONO “at the time of, during, and until the time the facility was evacuated after Hurricane Katrina on September 1, 2005, Touro as lessor to SHONO was required to provide air conditioning and supply emergency power to that portion of its facility which comprised the SHONO Unit; the leased premises.” [22] The district court thus |14construed the Lease and Service Agreements as unambiguously (as a matter of law) imposing on Touro an obligation *1081 (duty) to provide emergency power and air conditioning to SHONO.[23]
In July 2011, the district court granted in part Aggreko’s motion for summary judgment as to the plaintiffs’ contract claims. The district court found that as to the contractual claim that Mr. Serou was a third party beneficiary of the HCPA, Ag-greko was entitled to summary judgment. The district court reasoned that there is no language in the HCPA indicating a benefit was intended for Mr. Serou. The district court, however, denied Aggreko’s motion for summary judgment as to the plaintiffs’ tort claims. The district court reasoned that there were genuine issues of material fact as to why the generator did not serve its intended purpose, including “whether there was a malfunction with the generator, when that malfunction may have occurred, and what role that malfunction played in Mr. Serou’s death, if any.” This court denied Aggreko’s writ application seeking review of this ruling. Serou v. Touro Infirmary, 11-1028 (La.App. 4 Cir. 7/25/11) (unpub.).
hr,Also in July 2011, the district court denied Aggreko’s motion for summary judgment on the cross-claim asserted by Touro against it finding genuine issues of material fact as to “whether the HCPA was breached, and if so, by whom and when.” This court denied Aggreko’s writ application seeking review of this ruling. Serou v. Touro Infirmary, 11-1024 (La.App. 4 Cir. 7/25/11) (unpub.).
On July 29, 2011, the district court granted Aggreko’s motion to sever and to continue the cross-claims of Aggreko and Touro from the trial of this matter. Before the trial, the plaintiffs settled and dismissed their claims against SHONO and Aggreko. Thus, the sole defendant at trial was Touro, and the sole claims at trial were the plaintiffs’ premise liability (negligence) claims.
In August 2011, a six-day bench trial was held. Following the close of the evidence, the district court took the case under advisement. While the case was under advisement (before rendering judgment), the district court held a hearing on Aggre-ko’s re-urged motion for summary judgment. On September 29, 2011, the district court granted Aggreko’s motion and found that Touro “failed to establish that Aggre-ko, LLC’s conduct was the proximate or legal cause of the Plaintiffs’ injuries.”
On October 5, 2011, the district court rendered judgment in the plaintiffs’ favor. In its reasons for judgment, the district court outlined the basis for its finding of fault on the part of Touro and SHONO as follows:
1) Touro had a responsibility to all patients on its premises. Specifically, *1082 Touro owed a duty to the patients in their facility to provide and maintain its premises in a safe and working condition, including taking all necessary steps to ensure emergency preparedness. This obligation extended to SHONO patients, despite the fact that SHONO operated totally independent from Touro.
|1fi2) Pursuant to the Lease and Services Agreement between SHONO and Touro, Touro was responsible for providing emergency backup power to the SHONO unit. Additionally, in a Motion for Summary Judgment submitted to this Court prior to trial, this Court ruled that Touro was contractually responsible to provide HVAC services to the SHONO unit. Thus, even though Mr. Gordon Serou, Sr. was a patient of SHONO, Touro still had a contractual obligation to provide him with proper dietary services, adequate water, emergency backup power, air conditioning, and proper communications amongst, and for, the staff treating him.... Touro failed to maintain an adequate care facility for Mr. Gordon Serou, Sr.
3)The Louisiana Second Circuit held in Gibson v. Bossier City General Hospital [594 So.2d 1382 (La.App. 2d Cir. 1991)] that hospitals owe an obligation to provide the particular patient care necessary for the particular patient, including protection from external circumstances within [the] control of the hospital. For example, during the course of trial, there was testimony from Touro executives that air conditioning was not included in the backup power plan beyond the third floor of the building. Although spot coolers were supposed to be placed in the SHONO unit, the Court was not convinced that this placement actually occurred. Mr. Gordon Serou, Sr. and other SHONO patients resided on the seventh floor of the Touro facility. It was certainly within Touro’s control to provide air conditioning to Mr. Gordon Serou, Sr. The Court finds that Touro failed in this respect.
4) Further, Touro allowed the physician it assigned to monitor the patients on the SHONO floor to leave the hospital on August 30, 2005. There was no conclusive testimony or evidence submitted to indicate that they assigned another physician to monitor the SHONO patients on Touro’s seventh floor before the mandatory evacuation of the hospital was completed two days later. However, Plaintiffs sufficiently established a major lack of communication by Touro executives to the SHONO staff regarding available supplies of food, water, and ice; physicians; means of communication; etc.
5) The Court finds SHONO to be primarily at fault for Mr. Serou’s death. The testimony of SHONO nursing supervisor, Sethany Johnson, clearly established that at the time of Mr. Ser-ou’s death, the SHONO Q7 unit was under-supervised, understaffed, improperly trained, and improperly advised as to what resources were available to them at Touro’s facility. Ms. Johnson testified that in the days pri- or to Hurricane Katrina making landfall, the SHONO unit was staffed with ten nurses. By the time the Q7 ward evacuated on Wednesday, August 31, 2005, there were only two SHONO nurses remaining. Although several patients passed during the days following Hurricane Katrina, at all times there were at least ten patients on |17the SHONO unit. Mr. Serou was a patient of SHONO, *1083 and as such, primary responsibility must lie there.
6) The Court additionally finds Touro had a contractual obligation to provide a safe, functional facility for SHONO patients.... Touro failed to provide Mr. Serou with a safe environment to facilitate adequate patient care.
The district court allocated fault 70% to SHONO, 30% to Touro, and 0% to Aggre-ko. The district court awarded wrongful death damages of $400,000 to the surviving spouse (Judy Serou), and $200,000 to each of the three surviving children (Gordon Serou, Jr.; Stephen Serou; and Dr. Michael Serou). The district court also awarded survival damages of $150,000. The total damages awarded were thus $1,150,000. Touro was cast in judgment for $345,000 (30% of $1,150,000), plus interest and costs. From this judgment, Touro appeals.
As noted, joined with this appeal is Tou-ro’s separate appeal from the district court’s judgment granting Aggreko’s motion for summary judgment dismissing Touro’s cross claim against it. Aggreko’s cross claim against Touro remains pending in the district court. Aggreko also filed an answer to Touro’s appeal from the granting of the motion for summary judgment seeking resolution of additional issues.[24]
1 ^DISCUSSION

Standards of Review

In civil cases, Louisiana courts of appeal apply the manifest error standard of review to the trier of fact’s factual findings. Hall v. Folger Coffee Co., 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. Under the manifest error standard of review, the trier of fact’s factual findings cannot be reversed unless the appellate court determines that those findings are manifestly erroneous. Detraz v. Lee, 05-1263, p. 7 (La.1/17/07), 950 So.2d 557, 561. When there are two permissible views of the evidence, the trier of fact’s choice between them cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
The manifest error standard of review also applies to “mixed questions of law and fact.” Brasseaux v. Town of Mamou, 99-1584, pp. 7-8 (La.1/19/00), 752 So.2d 815, 820-821. However, “[ajppeal of a district court’s ruling on the admissibility of evidence is a question of law and is not subject to the ‘manifest error’ rule,” 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, § 2.10 (2012 ed.). Questions of law are reviewed de novo. See First Nat. Bank, USA v. DDS Const., LLC, 11-1418, pp. 10-11 (La.1/24/12), 91 So.3d 944, 952.

*1084
Principal Demand of the Plaintiffs

In any negligence action, including a premises liability action, the plaintiff has the burden of proving by a preponderance of the evidence the following five elements: 1) duty of care owed by defendant to plaintiff; 2) breach of that duty by defendant; 3) cause-in-fact; 4) legal causation; and 5) damages to plaintiff caused | )9by that breach. Zimko v. American Cyanamid, 03-0658, p. 21 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, 481-82. Touro contends that none of the five elements has been satisfied.[25]

Duty and Breach

Whether a duty is owed — the threshold issue in a negligence case-is a question of law. Ponceti v. First Lake Properties, Inc., 11-2711, p. 2 (La.7/2/12), 93 So.3d 1251, 1252; see also Harris v. Pizza Hut of La., Inc., 455 So.2d 1364, 1371 (La.1984). Whether a legal duty is owed by one party to another depends on the facts and circumstances of the case and the relationship of the parties. Montgomery v. Max Foote Const. Co., 621 So.2d 90, 92 (La.App. 2d Cir.1993). Whether the duty was breached is a question of fact. Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La.1993).[26]
In this case, Touro does not dispute that it had a duty; rather, it disputes the district court’s imposition of an alleged “overly-onerous” duty. Touro’s position is that its only duty to Mr. Serou was as lessor of the premises. It points out that a lessor’s duty is simply to repair known defects in the premises.[27] Touro contends |2flthat it *1085 owed no independent duty to Mr. Serou as a healthcare provider because he was not its patient before or after Hurricane Katrina. It thus contends that the Gibson case, which the district court cited in its reasons for judgment, is distinguishable. The Gibson case was a medical malpractice case in which a hospital was found to have a duty to its own patient to protect the patient from the hospital’s employee’s negligence. As noted, Touro’s position is that Mr. Ser-ou was never its patient.
Touro still further contends that the district court erred in finding it owed an independent duty to Mr. Serou to maintain the environment of care at SHONO during and after Hurricane Katrina. Touro argues that the district court erred in relying on its pre-trial ruling on SHONO’s motion for summary judgment to impose a duty to provide air conditioning to Mr. Serou, a SHONO patient. Touro contends that the district court ignored the distinction between holding Touro had a duty to SHO-NO, another party to the Lease and Services Agreement, and holding that Touro had a separate, independent duty to the “customer” of its lessee, Mr. Serou.
Touro further argues that by finding it owed a duty to the plaintiffs based on the Lease and Services Agreement, the district court, in essence, found they were third party beneficiaries of that contractual arrangement with SHONO. Touro contends that this finding is incorrect and inconsistent with the holding in State v. Joint Comm’n on Accreditation of Hospitals, Inc., 470 So.2d 169, 170 (La.App. 2d Cir.1985) (the “JACH ” case), which rejected a similar argument. The JACH case [^involved the alleged negligent inspection and accreditation by the Joint Commission of a state hospital. Rejecting the argument that the hospital’s patients were third party beneficiaries, the court reasoned that “[a]ny benefit in favor of the hospital’s patients which resulted from the contractual agreement was merely incidental. JCAH did not contract to monitor, regulate or supervise the standard of Conway’s patient care.” Id. at 178. By analogy, Touro contends that the plaintiffs are not third party beneficiaries of the Lease and Services Agreements between Touro and SHONO. Touro also argues that it did not breach any duty to Mr. Serou because industry standards and custom in effect at the time of Hurricane Katrina did not require hospitals to provide air conditioning in the event of an emergency and failure of outside power sources.
The plaintiffs counter that, given the specialized facility Touro was providing to SHONO, a special relationship was created that gave rise to a duty of care to all patients in its facility. Moreover, they point out that, under the Services Agreement, Touro was still providing some services to SHONO’s patients, such as therapy and transportation services. Alternatively, the plaintiffs contend that Touro assumed a duty of care to SHO-NO’s patients. They contend that by choosing to shelter in place, Touro voluntarily assumed the duty to provide a safe environment for all the patients in its facility, including SHONO’s patients. In support of this contention that Touro assumed a duty to all patients, the plaintiffs cite the trial testimony of Dr. Kevin Jordan that “we [Touro] had a responsibility because the [SHONO] patients were physically located in the building, to make sure the patients were getting the same level of care as anyone else.”[28]
*1086 122The plaintiffs’ theory of the case is that Mr. Serou died from hyperthermia in the wake of Hurricane Katrina because Touro chose to shelter in place without any intent of providing adequate ventilation, air conditioning, or both to the SHONO patients on the seventh floor of its facility. The plaintiffs, at trial and on appeal, relied on the prior summary judgment ruling as establishing Touro’s duty to provide air conditioning to the SHONO unit. The plaintiffs contend that the Lease Services Agreement and the district court’s judgment on SHONO’s summary judgment motion are devoid of any language limiting Touro’s obligation to provide air conditioning in the event of an emergency power outage. They contend that the district court therefore did not err in finding that Touro had a duty to provide air conditioning to the SHONO patients, including Mr. Serou, in the event of an emergency power outage.
The plaintiffs contend that Touro breached its duty by failing to plan to provide air conditioning (chilled air) to any floor above the third floor. They further contend that because Touro did not plan to provide air conditioning to the upper floors, Touro should have taken the following steps on the upper floors (including the seventh floor): monitored the ambient temperature, monitored the patients for heat-related symptoms, or moved patients to a cooler part of the hospital in the event the temperature became unbearable.
To place the issues presented in context requires we briefly outline the applicable standards regarding emergency preparation in a hospital setting. The applicable standards, as Touro’s expert and lay witnesses testified, are those established by the Joint Commission of the Accreditation of Hospital Organizations (“JCAHO”). JCAHO is responsible for accrediting health care organizations such as hospitals. As noted elsewhere, the Services Agreement [^required that Touro comply with JCAHO standards. Two of Touro’s experts, George Jamison and Dr. James Aiken, testified that JCAHO standards are not minimum standards. Indeed, Mr. Ja-mison characterized JCAHO standards as “the Cadillac of standards, constantly evolving and changing, upgrading.”
JCAHO standards require hospitals to demonstrate emergency preparedness by showing they have an emergency management plan that addresses the following six areas:
1) Communications — To ensure adequate communication in an emergency or disaster situation, internal communication, and external communication to community care partners and state and federal agencies, including backup capabilities, must be considered.
2) Supplies — Adequate levels and appropriateness for hazard vulnerabilities must be determined.
3) Security — Appropriate security will enable normal hospital operations during an emergency, and also protect the safety and security of staff and property.
4) Staff — Proper preparedness requires defining roles and responsibilities within a standard Hospital Incident Command Structure.
5) Utilities and Water Resources— Planning must include adequate resources to enable self-sufficiency for as long as possible, with a goal of 96 hours.
6) Clinical Activity — Concerns include maintaining care, supporting vulnera *1087 ble populations, and considering alternate standards of care.
Bruce A. Cranner and Toni J. Ellington, A Guide for In-House Counsel: Hospital Emergency Planning for Disasters, Natural and Man-Made, In-House Defense Quarterly 8, 9-10 (Spring 2012).
According to JCAHO standards, health care providers should first perform a hazard vulnerability analysis in order to decide the best methods in which to respond to disasters. JCAHO’s New Emergency Planning Rules Require Hazard Vulnerability Analysis, 7 No. 11 OSHA Guide for Health Care Facilities 124Newsletter 3 (June 2001). The emergency management plan should “coordinate the logistics of maintaining supplies of food, drugs and other critical medical supplies throughout an emergency.” Id. “If the health care facility will be providing continuous service during a disaster or emergency [sheltering-in-place], the plan should identify how to secure backup sources of power, water and ventilation, if necessary.” Id. (Emphasis supplied).
At trial, Touro’s corporate representative, Scott Landry, who was Director of Facilities Management at the time of Hurricane Katrina, testified as a fact witness. Mr. Landry was questioned regarding a 2003 Touro Safety Committee Quarterly Report, which included the following statement:
Utilities Management Plan (EC 1.7): Building utilities and utility systems play a vital role in the everyday operation of health care facilities. Although these utilities are usually taken for granted during normal operating conditions, they provide many necessities, such as air, lighting, water, and power for facility equipment. The Utilities Management Plan describes how the hospital will establish and maintain a utilities system for life support, surveillance, prevention, and control of infection, environment support and equipment support. (Emphasis supplied).
Mr. Landry explained that “EC,” which means environment of care, is a component of the JCAHO accreditation process. When asked whether the reference to “air” in the above-quoted provision refers to “air conditioning” being a necessity, Mr. Landry replied in the negative. His understanding was that the reference to “air” does not mean air conditioning; rather, it means ventilation. Explaining his answer, he noted that this provision talks about “air,” but “[t]he [JCAHO] requirements talk about ventilation.” Continuing, he explained that “if the intent was that it was going to be air conditioning then it would say HVAC [heating, ventilation, and air conditioning]. It wouldn’t say air. It wouldn’t say ventilation.”
12SMr. Landry acknowledged that, pursuant to the Lease and Services Agreement, Touro was responsible for providing emergency backup power and air conditioning to the SHONO unit, the leased space. However, he testified that it was not Tou-ro’s responsibility to provide air conditioning to the SHONO unit when Touro was on emergency backup power, as it was post-Hurrieane Katrina. Mr. Landry explained that providing air conditioning in the event of an outside power failure was not a requirement under the JCAHO guidelines and for that reason, it was not included as a requirement under its contractual arrangements with SHONO. At this juncture, the district court asked Mr. Landry for clarification.
The district court sought to clarify the meaning that Mr. Landry was giving to the term “air conditioning.” The district court pointed out that during the course of the trial it heard two different definitions of the term “air conditioning.” This distinction was made by Touro’s expert wit *1088 ness, Mr. Jamison, a surveyor for the JCAHO Life Safety Codes and emergency preparedness (EC-1 to EC-7). Mr. Jami-son testified that when referring to the term “air conditioning,” a distinction must be made between two concepts: refrigerated (chilled) air and conditioned (moved) air.
In response to the district court’s request that he clarify which concept he was referring to, Mr. Landry replied that he was unaware of any regulations that required refrigerated (chilled) air in the patient areas as a backup. Mr. Landry, however, agreed that the conditioning (moving) of air was required by the regulations. He further testified that Touro satisfied the requirement of providing for the movement of air on the SHONO unit post-Hurrieane Katrina by “[o]pening windows and having fans [spot coolers] to cross ventilate the space.”
12f,Mr. Landry still further testified that he implemented the spot cooler plan and that he was certain the spot coolers were on the SHONO unit for the hurricane. He expressly disagreed with Nurse Johnson’s testimony that the spot coolers were not on the SHONO unit. He acknowledged there was no provision to monitor the ambient temperature on the unit; however, he pointed out that Touro had floor walkers. He also disagreed with Nurse Johnson’s statement that it got very hot. He testified, like other Touro witnesses, that it got “warm.”
At trial, Mr. Jamison — who was qualified as an expert in the field of Plant Operations, Director of Plant Operations for Hospitals and Hospital Systems— opined that in August 2005, the JCAHO Life Safety Codes did not require that hospital patients be provided with air conditioning, i.e., cooler air coming through the vents as if it was under normal operations. Employing the distinction he articulated between refrigerated and conditioned air, Mr. Jamison testified that “refrigerated air is not [a life safety requirement for a hospital], the conditioning of air is” a requirement. He explained that “if air is not moved it becomes totally stale.”
According to Mr. Jamison, the JCAHO requirement of conditioning, filtering, or moving of air can be satisfied by opening windows, using box fans, or using spot coolers. Mr. Jamison noted that hospitals generally screw their windows shut to avoid accidents; hence, hospitals can satisfy the requirement by unscrewing the -windows, opening the windows, putting a fan in, or using a spot cooler to lift the air. Mr. Jamison testified that if Touro opened windows and had box fans and spot coolers to lift the air, it satisfied the JCAHO requirement.
Mr. Jamison opined that the inability to provide refrigerated air conditioning in a hospital — even in August in New Orleans — is not a life threatening condition. 127When asked to explain his answer, which the district court allowed, yet noted was “lay opinion” — Mr. Jamison responded:
“The reason that I think it’s not, because you can take other means to cool somebody down, or you can commingle them to another place. Or actually if you got ice and power, like they had, they had food and ice and power and stuff, you can actually put ice bags around them if they were going that bad, or mist them. Or if you had fans, the old, even though it doesn’t work good, the swamp cooler effect, atomize water on them and let it evaporate off them.”
Echoing Mr. Jamison’s testimony, a trio of physicians — Dr. James Aiken, Dr. Jordan, and Dr. Borgman — described multiple nursing interventions besides refrigerated *1089 air that may be used to cool down a patient and to ameliorate heat-related symptoms.
Dr. Aiken, who was qualified as an expert in the clinical aspects of hospital emergency preparation, testified that the resources available to a physician seeking to treat a patient suffering from heat-related illness in a facility without air conditioning include cooling devices, such as fans or ice or anything that allows the body to transmit heat from itself to the environment; IV fluids, which can be administered by gravity and without an IV pump; and misting the patient. He further testified that “[m]ost of the care that we provide in hospitals does not critically need electricity.” He still further testified that, in his professional opinion, there was no reason that a patient who was receiving critical care would die of a heat-related illness.
Dr. Jordan, an emergency care expert, testified that in an emergency backup power mode without air conditioning, “the easiest thing to do is basically wet the patient down preferably with wet towels and then blow a fan over them,” which will bring a patient’s core body temperature down. Similarly, Dr. Borgman, an internal medicine expert, testified that the nursing interventions available to 12Scounter the effect of “heat-like symptoms” include misting down a patient with water and manual IV feeds by gravity.
To recap, both Touro’s expert witness (Mr. Jamison) and lay witness (Mr. Landry) testified that the ability to provide refrigerated air to any part of the hospital, including the SHONO unit, was not a JCA-HO requirement. Touro also presented three medical experts who testified that there were alternative methods to refrigerated air available to cool down a patient and to ameliorate the adverse effects of any heat-related symptoms a patient might experience.
The sole evidence presented by the plaintiffs to establish a requirement on Touro’s part to provide refrigerated air to the SHONO unit was the testimony of their emergency preparedness expert, Robert R. Latham, Jr.[29] Mr. Latham, who was the Mississippi Emergency Management Director during Hurricane Katrina, acknowledged that he had never worked in health care. Nonetheless, he testified that hospital emergency management plans are “Emergency Management 101 functions,” as opposed to uniquely health care functions. Mr. Latham further testified that a hospital should be prepared to offer basic needs even in an emergency situation.
The gist of Mr. Latham’s testimony was that air conditioning (refrigerated air) is a “basic need” for a vulnerable patient population.[30] In particular, he testified that included in the concept of a basic need is “an environment that would certainly, in my opinion, and I’m certainly not a medical professional, but I would |a9tell you that in disaster planning ... when we develop *1090 shelters for special needs[31] population ... that obviously environmental control is one of the things [considered] because ... [i]f you don’t take care of that then you’re probably going to have fatalities.” He testified that in his experience special needs shelters are not set up without air conditioning. Over defense counsel’s objection, Mr. Latham was allowed to opine that air conditioning should be provided in an emergency situation to the most vulnerable patient population, which he assumed to mean those with special medical needs.[32] Mr. Latham also noted that Touro included HVAC power as a part of its hazard vulnerability analysis. If HVAC power was not a basic need or a critical function, he testified that Touro would not have included it in its hazard vulnerability analysis, which is regularly reviewed.
Mr. Latham’s criticism of Tou-ro’s failure to plan for providing air conditioning (refrigerated air) for its vulnerable patient population was based on his own personal opinion as to what a hospital should do, as opposed to any objective standards establishing what a hospital is required to do. As the Louisiana Supreme Court has admonished, “experts may not rely on their own conclusions as authority in the absence of any objective support” Carrier v. City of Amite, 10-0007, pp. 5-6 (La.10/19/10), 50 So.3d 1247, 1250(citing Grdinich v. Bradlees, 187 F.R.D. 77 (S.D.N.Y.1999) (holding the expert’s testimony was without foundation because “[without ‘industry standards’ to rely upon, [the expert] seems to base his conclusions on his own authority”)). Mr. Latham, like Sears’ expert in 130the Carrier case cited no industry standards in support of his opinion that Touro had a duty to provide for refrigerated air condition for vulnerable patient populations, such as SHONO’s patients, in the event of an outside power failure. In contrast, as discussed above, Touro presented expert testimony that JCAHO standards did not require hospitals to provide refrigerated air condition in the event of an outside power failure.
Although the record does not support a finding that Touro had a duty to provide refrigerated air conditioning to SHONO’s patients, the record does support a finding that Touro had a duty to provide adequate ventilation (conditioned air). As Mr. Landry testified, Touro’s plan to satisfy that requirement called for two spot coolers on the SHONO unit and to break windows, if necessary, to provide ventilation. The district court made a factual finding that Touro failed to provide the two spot coolers. That finding is not manifestly erroneous. As noted, Nurse Johnson testified that she worked in the area of the nursing station where the spot coolers were designated on the map to be located, yet she did not recall seeing any spot coolers. Dr. Jordan, in response to the district court’s questioning, testified that he could not remember seeing spot coolers on the SHONO unit when he made rounds there. Touro did present testimony that it broke windows after Hurricane Katrina; however, there was no testimony *1091 that it broke any windows on the seventh floor where the SHONO unit was located. The record thus supports a finding that Touro failed to provide adequate ventilation to the SHONO unit.

Causation

In this part, we address Tou-ro’s contention that the district court’s judgment should be reversed because the plaintiffs failed to prove causation. The district | ai court assigned fault to both Tou-ro and SHONO and, thus, implicitly found that the plaintiffs met their burden of proving causation. The district court’s reasons for judgment, however, are silent as to the basis for its causation finding. Having reviewed the record, we conclude that the plaintiffs met their burden of proof and find no merit in Touro’s assignment of error on this point. Under Louisiana law, a plaintiff in a tort case must prove causation by a preponderance of the evidence. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993); Maranto v. Goodyear Tire & Rubber Co., 94-2603, 94-2615 (La.2/20/95), 650 So.2d 757 (holding that a plaintiff in a personal injury suit has the burden of proving a causal relationship between the injury and the accident which caused the injury). Causation is a question of fact and is subject to the manifest error standard of review. Green v. K-Mart Corp., 03-2495, p. 3 (La.5/25/04), 874 So.2d 838, 841. Expert medical testimony is required when the conclusion regarding medical causation is one that is not within common knowledge. Chavers v. Travis, 04-0992, p. 10 (La.App. 4 Cir. 4/20/05), 902 So.2d 389, 395 (citing Hutchinson v. Shah, 94 0264, p. 3 (La.App. 1 Cir. 12/22/94), 648 So.2d 451, 452).
Although this is not a medical malpractice case, the plaintiffs nonetheless had the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. Indeed, the Louisiana Supreme Court in LaCoste, supra, expressly noted that while the allegations of failure to provide sufficient emergency power and to have a plan to evacuate were not medical malpractice claims and while expert medical evidence was not required to establish the wrongful conduct, expert medical evidence likely was required to establish causation. La-Coste, 07-0008 at p. 11, 966 So.2d at 526-27 (noting that “[ejxpert [¡^medical evidence may be necessary to establish causation with regard to the death of Mrs. LaCoste.”).
Touro contends that the plaintiffs failed to prove that it caused or contributed to Mr. Serou’s death or suffering. Simply stated, Touro’s position is that no qualified witness testified that Mr. Serou expired as a result of hyperthermia or the environmental conditions at Touro or SHONO. Touro emphasizes that Dr. Tedesco, the physician who pronounced Mr. Serou dead and wrote the hurricane note in his chart, testified at trial that he had no opinion as to the cause of Mr. Serou’s death. According to Touro, the sole suggestion in the record that Mr. Serou died from hy-perthermia or the environmental conditions at Touro or SHONO is a single, eight word progress note (hurricane note) written on August 31 by Dr. Tedesco, which reads: “Hurricane note Pt. [patient] expired 2° [secondary to] heat 5 PM.”
The plaintiffs counter that they proved that Mr. Serou’s cause of death was due to heat, hyperthermia. Citing McKelvey v. City of Dequincy, 07-0604, p. 9 (La.App. 3 Cir. 11/14/07), 970 So.2d 682, 689, they contend that they were required to provide the court only with competent evidence of the cause of death. The competent evidence they presented, according to the plaintiffs, consists of Dr. Tedesco’s August 31 chart note, Dr. Tedesco’s deposition *1092 testimony in which he held to his position that Mr. Serou died secondary to heat, and his trial testimony in response to a hypothetical question that heat was a possible cause of Mr. Serou’s death. Alternatively, they contend that the so-called Housley presumption, which is based on Housley v. Cerise, 579 So.2d 973, 980 (La.1991), applies and that proof of a reasonable possibility of a causal connection is sufficient.
laaOur review of the entire record reveals that the plaintiffs introduced sufficient evidence to support the district court’s finding of causation. As noted, Dr. Tedesco officially pronounced Mr. Serou dead on August 31 and wrote an entry in the Mr. Serou’s chart, which reads: “Hurricane note Pt. [patient] expired 2° [secondary to] heat 5 PM.” Dr. Tedesco identified this chart note in his July 1, 2010 deposition testimony and stood by his August 31, 2005 conclusion as to the cause of Mr. Serou’s death. Specifically, Dr. Ted-esco testified in his deposition that one to two SHONO patients died due to hyperth-ermia in the aftermath of Hurricane Katrina. Further, at the time of his deposition, Dr. Tedesco, unlike all other medical caregivers who testified in this matter, seemed to have some recollection of Mr. Serou:
I can’t recall the name. I remember writing that note, and I have a feeling I know which patient it is, but I can only speculate.
* ⅜ *
I don’t specifically remember going up and examining him. I sort of — I try to walk through every ward, every floor, every ward on each floor several times a day just because our communications were limited even within the hospital, just so — to make sure there are no nursing needs they needed from physicians or anything like that.
And several times going through that unit, I noted that we had some serious problems with patients with very high fevers. I don’t remember if this was the guy. It was either this patient or another one that had a fever of, I believe, of 107 or 106. And that was why we started knocking windows out.
On deposition cross-examination, Dr. Tedesco admitted that: 1) he did have an opportunity to examine Mr. Serou while Mr. Serou was alive; 2) his chart note was based on his examination of Mr. Serou’s chart and conversations -with the SHONO nurses; 3) the last reported observations of Mr. Serou — charted on August 31, 2005 — indicate that Mr. Serou was in stable condition; 4) the results of Mr. |34Serou’s autopsy — performed nearly two months later on October 20, 2005 — are inconclusive as to the cause of death. On redirect examination, Dr. Tedesco, however, testified that hyperthermia could have set in between the time that the nurses stopped charting on Mr. Serou — August 29, 2005 — and the time that Dr. Tedesco wrote the August 31, 2005 chart note. Dr. Tedesco also testified that Mr. Serou’s October 20, 2005, autopsy indicated that the body was in a state of “advanced postmortem decomposition” and that this state would have made it more difficult to perform an autopsy. The deposition concluded with the following colloquy, initiated by counsel for the Serou plaintiffs:
Q. Based on everything that you’ve been shown and what you remember and what you have in front of you, do you feel that more probably than not the reason that this man died was due to the heat?
A. More probably than not? Yeah, I still feel that way.
At trial, Dr. Tedesco no longer had any recollection of examining Mr. Serou prior to writing the chart note. Further, Dr. Tedesco also recanted his chart note and *1093 his prior deposition testimony with respect to Mr. Serou’s cause of death; particularly, he testified in response to the plaintiffs’ counsel’s questions as follows:
Q. Now, when I took your deposition on July 1, 2010, you told me, isn’t it true you told me that more probably than not, not absolutely positively, more probable than not Mr. Serou died due to the heat, is that correct?
A. That’s correct.
Q. And what I’m asking you here today is it still your opinion that Mr. Serou died more probably than not due to heat?
A. No, I don’t. Like I said, it’s kind of embarrassing but I kind of go into that statement the same way that I did see the patient when I first saw him, with no knowledge. I walked in only seeing him after he already died, did not review the chart.
IssThe plaintiffs’ attorney then showed Dr. Tedesco an excerpt from the chart of Mr. Serou’s roommate in the SHONO unit. On the night of August 31, apparently a few hours after Mr. Serou died,[33] a SHO-NO nurse wrote in the roommate’s chart the following: “[r]oom is unbearably hot.” Based on this additional information, Dr. Tedesco testified that he was “not saying that it ruled out that he died of heat, it’s certainly a possibility. I just have no way of telling you given his previous condition there’s no way to say what it was.” The plaintiffs’ attorney again questioned Dr. Tedesco regarding his prior deposition testimony.
Dr. Tedesco acknowledged that in his deposition, even after the deficiencies in the chart were called to his attention, he stated that it was his opinion that Mr. Serou died from heat. Dr. Tedesco also testified that after his deposition, Touro’s attorneys met with him and discussed his testimony regarding Mr. Serou.[34] The following colloquy between the plaintiffs’ counsel and Dr. Tedesco then took place:
Q And so the real question to me is what is so dramatically changed from the day you wrote that note and the day you gave me your deposition, that you have come into this court, and I believe, or at least partially changing your opinion today?
A Well because now for the first time I have gone back and looked through the chart myself, just because the guy was never a patient of mine. So I kind of took a lot of things for granted in going in there. And so I just wanted to be comfortable with myself when I was looking at it. And when I looked back at it I don’t feel as comfortable making that call.
Nevertheless, at trial Dr. Tedesco admitted that it was a “reasonable possibility” | o.fjthat Mr. Serou died from heat related symptoms and that, in general, it was “certainly a good chance” that other Touro patients died from heat related causes in the aftermath of Hurricane Katrina.
In sum, the two areas of divergence between Dr. Tedesco’s deposition and trial testimony were that he no longer recollected Mr. Serou, and that he retracted his *1094 opinion as to the cause of Mr. Serou’s death.[35]
At the beginning of trial, the district court refused the plaintiffs’ request to-admit Dr. Tedesco’s deposition.[36] Following Dr. Tedesco’s trial testimony in which he recanted the hurricane note and deposition opinion testimony, the district court allowed the deposition into evidence. Tou-ro objected to the introduction of the deposition on the grounds that the doctor’s in-court statements constituted the best evidence of his testimony. Touro lodged no other objection to the use of Dr. Tedesco’s deposition and did not ask the district court to limit its use in any way. Likewise, Touro does not allege on appeal that the admission of Dr. Tedesco’s deposition testimony was in error, complain about the plaintiffs’ allusion to the deposition, or criticize the district court’s purported reliance on the deposition testimony. We acknowledge the general jurisprudential principal that Dr. Tedesco’s deposition testimony should only have been admitted as impeachment evidence (prior inconsistent statement), not as substantive evidence in this civil case. See Marshall v. Duncan, 542 So.2d 691, 695 (La.App. 4th Cir.1989) (holding that the use of a prior inconsistent statement is limited to impeachment 1 S7and cannot be utilized as substantive evidence). Nevertheless, it is clear that the district court was confronted with inconsistent testimony from Dr. Tedesco, and thus was compelled to make a credibility call as to the accuracy of Dr. Tedesco’s in-court testimony. Having reviewed the record, we cannot state that the district court’s apparent decision to discount Dr. Tedesco’s trial testimony was in error.
Likewise, we are not prepared to state that the district court erred in its substantive use of Dr. Tedesco’s deposition. First, as noted, Touro failed to object to the district court’s substantive use of the deposition and failed to allege as error any such reliance. Second, out of all the medical testimony introduced into evidence, Dr. Tedesco’s deposition testimony presented the only instance of a physician who seemed to have some recollection of Mr. Serou and the conditions in his room. Third, our review of the record indicates that, save his recollection of Mr. Serou and the retraction of his opinion on cause of death, there is little else of substantive difference between Dr. Tedesco’s deposition and trial testimonies. Fourth, Dr. Tedesco’s deposition is supported by other evidence in the record. As noted, six of the sixteen patients in the SHONO unit died in the aftermath of Hurricane Katrina between August 29 and 31.[37] The plaintiffs contend that it got “unbearably hot” in the SHONO unit. Leslie Hirsch was Touro’s CEO at the time of Hurricane *1095 Katrina. Touro introduced Hirsch’s deposition testimony into evidence. In the deposition, Mr. Hirsch, when asked about the climatic conditions inside Touro after Hurricane Katrina’s passing, stated:
There’s no doubt about it, it was warm. You know, it was not comfortable and it was humid, you know, it was very humid. You|asknow, the air where there weren’t fans, you know, to help circulate the air or I knew they had broke out some windows to try to let air in and help circulate the air, there’s no doubt about it, it was uncomfortable. It was very warm.
Later, Mr. Hirsch testified that conditions in the hospital were “very hot” and “very uncomfortable.” For example, the plaintiffs introduced an article entitled “In the Eye of the Storm,” which was published in the Winter 2005 edition of the Touro Focus. In the article, Mr. Hirsch, is quoted as stating that in the aftermath of the hurricane, “[o]ur [Touro’s] backup generators were failing. We began losing lighting, air conditioning and elevator service. It quickly became unbearably hot, especially for patients.” The plaintiffs also introduced the SHONO Nurse’s note in Ms. Serou’s roommate’s chart stating that the “[r]oom is unbearably hot.” At trial, however, the remainder of Touro’s witnesses testified, almost identically, that conditions in the hospital were merely “warm.” The plaintiffs also point out that the SHONO nurses communicated with Dr. Tedesco regarding the patient’s condition and the environment of care before he declared Mr. Serou dead and wrote the hospital note.
The burden of establishing medical causation was on the plaintiffs. Touro presented three medical experts who opined that Mr. Serou did not die from hyperther-mia, although they had no idea as to the actual cause of Mr. Serou’s death. The district court in its reasons for judgment, as Touro points out, contains no discussion of the issue of whether the plaintiffs satisfied their burden of establishing causation. Taken together, Dr. Tedesco’s hurricane chart note and his deposition opinion indicate that it was more probable than not that Mr. Serou died from hyperthermia. For the reasons discussed above, the district court did not err in relying on that recanted deposition opinion testimony regarding the hurricane note | aflas substantive evidence. The plaintiffs, accordingly, presented sufficient medical evidence that Mr. Serou died as a result of hyperther-mia.
Because the plaintiffs presented sufficient evidence that Touro was a cause of Mr. Serou’s death or suffering, the district court did not err in rendering judgment in the plaintiffs’ favor and against Touro.[38]

Comparative Fault

In this part, we address Touro’s assertion that the district court erred in its allocation of comparative fault between Touro and SHONO. As noted, the district court allocated fault 70% to SHONO, 30% to Touro, and 0% to Aggreko. Specifically, Touro argues that the testimony and evidence presented at trial does not support the apportioning of any percentage of fault to Touro. Touro, instead, argues that the evidence establishes that the primary causes for Mr. Serou’s death were the actions and inactions of SHONO and its staff. Touro’s staff, it argues, fulfilled all of SHONO’s needs during Hurricane Katrina and the storm’s aftermath. The plaintiffs, on the other hand, argue that in *1096 the aftermath of Hurricane Katrina, the hospital facility became unfit for patient care, its intended use, because of Touro’s failure to adequately prepare to weather a hurricane. Specifically, the plaintiffs point to the testimony of SHONO nurse, Setha-ny Johnson, who testified that after the storm passed, the SHONO ward lost air-conditioning and ventilation. Nurse Johnson also testified that: 1) the windows in the SHONO patient rooms would not open; 2) there was no running water; 3) there were no working toilets; 4) there were no cold packs; and 5) there were no lights aside from the nurses’ station. The plaintiffs also cite to testimony from several 140Touro employees who testified at trial as to having concerns, prior to the time it was evacuated, that Touro’s facility could adequately support patient care. The plaintiffs, thus, argue that the district court did not err when it found that Touro failed to meet its “contractual obligation to provide a safe, functional facility for SHONO patients.”
With regard to allocation of fault, great deference is afforded to a trier of fact. Clement v. Frey, 95-1119, 95-1163, p. 7 (La.1/16/96), 666 So.2d 607, 610. “[A]llocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the fact finder within that range cannot be ‘clearly wrong.’” Foley v. Entergy La., Inc., 06-0983, p. 32 (La.11/29/06), 946 So.2d 144, 166. Only after making a determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award. Clement, 95-1119, p. 7, 666 So.2d at 611. In determining allocation of fault, a trier of fact is obligated to consider the nature of each party’s wrongful conduct and the extent of the causal relationship between that conduct and the damages suffered. See Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 971 (La.1985). When considering the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) the size of risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Clement, 95-1119, p. 7, 666 So.2d at 610.
Upon a careful review of the record, and after having discussed the facts at length over the course of this opinion, we find that the district court’s findings as to |4,the allocation of fault are reasonable and were not clearly wrong. Accordingly, Touro’s assignment of error on this point is without merit.

Damages

In this part we turn to Touro’s assertion that the district court’s award of damages was excessive and must be reduced. As noted, the district court awarded wrongful death damages of $400,000 to the surviving spouse (Judy Serou), and $200,000 to each of the three surviving children (Gordon Serou, Jr.; Stephen Serou; and Dr. Michael Serou). The district court also awarded survival damages of $150,000. The total damages awarded were, thus, $1,150,000. Touro was cast in judgment for $345,000 (30% of $1,150,000), plus interest and costs. On appeal, Touro asserts that each of the awards is excessive, unsupported by the evidence adduced at trial, and out of line with past awards made under similar circumstances.
Damages for wrongful death are intended to compensate a victim’s beneficiaries for their loss following the victim’s death. Turner v. Lyons, 03-0186, p. 11 (La.App. 4 Cir. 1/28/04), 867 So.2d 13, *1097 21. Elements of damages for wrongful death include loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Id. A trier of fact is afforded much discretion in rendering an award because the trier is in the best position to evaluate witness credibility and see the evidence firsthand. Munch v. Backer, 10-1544, p. 8 (La.App. 4 Cir. 3/28/11), 63 So.3d 181, 188. The discretion vested in a trier of fact is ‘great,’ and even vast, so that an appellate court should rarely disturb an award of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). If an abuse of discretion is found, it is incumbent upon this court to determine the greatest or least amount that the fact finder could have reasonably awarded, and | ^either raise or lower the award to that extent. Id. However, before a district court’s award of damages can be questioned as excessive or inadequate, the reviewing court must look first, not to prior awards, but to the individual circumstances of the instant case. Coco v. Winston Industries, Incorporated, 341 So.2d 332 (La.1977). Our review of the trial testimony and evidence reveal no abuse of discretion by the district court. The total damage award of $1,150,000.00 is not an abuse of the district court’s vast discretion.
Our review of the testimony and the evidence supports the district court’s finding that Mr. Serou had a close and loving relationship with his wife and sons. Mr. and Mrs. Serou married when she was sixteen years old. Mrs. Serou testified to never knowing another man and that Mr. Serou was still the love of her life at the time of his death. The record indicates that the Serou family enjoyed the usual things families did such as hobbies, like model railroading, sports-related activities engaged in by some of the sons, vacations, and participation in work functions and church events. After Mr. Serou was first diagnosed with Parkinson’s disease in the 1980’s, and even more so when it became limiting in the 90’s, Mrs. Serou and her sons cared for Mr. Serou in their home. It was not until after he broke his hip in 2003 that he went in into custodial care at Wol-denberg Nursing Home. During the period of time he was in Woldenberg, from 2003 until his admission to Touro in 2005, Mrs. Serou visited him virtually every day. Mrs. Serou testified to visiting Mr. Serou, caring for him, reading to him, and feeding him on a daily basis, despite his medical condition while he was in Woldenberg. Clearly, Mrs. Serou was devoted to Mr. Serou and loved him deeply. After Mr. Serou was admitted to Touro and then SHONO, Mrs. Serou continued to see him every day until she was | ^informed that she would not be allowed to stay with him at the hospital during the storm.
All three of Mr. Serou’s sons testified to having a close and loving relationship with their father. Gordon, Jr., the oldest son, testified that he visited his father two times a week while Mr. Serou was at Wol-denberg. After Mr. Serou was admitted to SHONO, Gordon Jr. testified to visiting him on weekends plus another day a week. Like Mrs. Serou, Gordon Jr. testified to assisting in Mr. Serou’s care. Gordon Jr. testified to visiting him, reading to him, telling him jokes and feeding him. Stephen, the middle son, lived at home as an adult with Mr. Serou. Thus, he was very involved in the care of Mr. Serou while he was home, but was unable to continue working due to complications from his Parkinson’s disease. After his father was moved to Woldenberg, Stephen testified to visiting him approximately once a month. He testified that he was unable to visit more often because he had to take over many of the household chores so that his mother was free to visit his father on a daily basis. Nevertheless, Stephen testi *1098 fied that he sat with his father while Mr. Serou was undergoing treatment in SHO-NO. Lastly, Dr. Michael Serou, the youngest son, testified that his father was sick from the time he was a teenager. He was very specific in his testimony about things his father could and could not do despite his disabilities. He testified to enjoying talking with his father, telling him jokes, reading to him, feeding him and taking care of him. He was the last family member to see Mr. Serou alive when he met with his father and fed him on the Saturday night prior Hurricane Katrina’s landfall.
Having reviewed the testimony and the evidence, we cannot say that the district court abused its discretion in awarding the four Serou plaintiffs a combined total of $1,000,000.00 in wrongful death damages.
| ^Likewise, we find no abuse of discretion in the district court’s award of $150,000.00 in survival damages. La. Civil Code art. 2315.1 A provides for survival actions as follows: “If a person who has been injured by an offense or quasi offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi offense, shall survive for a period of one year from the death of the deceased.” Generally, survival damages are warranted if plaintiff presents any evidence (“a scintilla”) of pain or suffering on the part of the decedent. Giammanchere v. Ernst, 96-2458 (La.App. 4 Cir. 5/19/99), 742 So.2d 572, 575. Fright, fear and mental anguish during the ordeal are compensable. Id., at 576.
Our review of the testimony reveals that Sethany Johnson, a qualified expert in nursing, testified regarding the general conditions to which Mr. Serou was exposed on the SHONO ward in the aftermath of the storm: “Several of the patients began to sweat profusely. They began to increase breathing. Their temperatures, when they were taken, became highly elevated. They became a little agitated or apprehensive and began to struggle.” Nurse Johnson also testified that symptoms of hyperthermia include air hunger or gasping for air, temperature elevations, elevated blood pressure, increased heart rate, nausea, vomiting and skin hot to the touch. Nurse Johnson testified that all of the SHONO patients, such as Mr. Serou, experienced at least some of these symptoms. Clearly, the plaintiffs presented, at the least, a scintilla of evidence in support of their claim for survival damages on behalf of Mr. Serou. Accordingly, the district court’s award of $150,000.00 in survival damages was not an abuse of discretion.
14gTouro’s Incidental Demand — Cross-Claim for Indemnification Against Ag-greko
In this part we address Touro’s assignments of error regarding the district court’s judgment that granted Aggreko’s motion for summary judgment on Touro’s claim for indemnification. Touro’s cross-claim for indemnification arises out of events that occurred near the start of the 2005 Hurricane season. In June 2005 Touro and Aggreko signed the HCPA, which provided that, in exchange for $15,075.00, Aggreko agreed to guarantee the availability to Touro of a pre-selected generator package in the event of a hurricane striking the New Orleans area. Specifically, the HCPA called for Aggreko to deliver to Touro the following: 1) one 800kW generator; 2) one filled 1,100 gallon external fuel tank; 3) one trailer; and 4) fifty 1.1 ton spot cooling units. The generator was intended to power certain pieces of equipment within the hospital that were components of Touro’s air conditioning system and were used to provide chilled air to the first three floors of Tou-ro’s main building. According to the *1099 terms of the contract, Touro was to tender full payment for Aggreko’s services by August 1, 2005. The facts show, however, that Touro’s accounts payable department did not prepare the check until August 25, 2005. Even then, the check was never tendered to Aggreko. The terms of the contract provided, however, that Aggreko was entitled to refuse performance on the HCPA in the event of Touro’s failure to tender timely payment.
Nevertheless, Aggreko delivered the generator package when requested to do so by Touro. Specifically, Touro’s Scott Landry spoke with Aggreko’s Todd Hastings on August 25 and 26, 2005, in order to arrange for the delivery of the generator package, which was delivered on Sunday, August 28, 2005. Touro lost power at approximately 3:00 a.m. on August 29, 2005. The Aggreko generator was activated at that time. While the testimony is somewhat conflicting, it is clear that |4fiTouro’s staff began to experience problems with the Aggreko generator almost immediately after it was activated and that it was completely inoperable within four hours of its initial activation.
Further, the evidence adduced at trial reveals that Aggreko failed to deliver an external fuel tank that was full of generator fuel. That is to say, Aggreko delivered an external fuel tank, but it was not full of generator fuel. After the hurricane had passed, and the full extent of the damage to the community came to be known, Tou-ro personnel concluded that they needed to obtain additional generator fuel. Subsequently, Touro accepted a delivery of fuel from a tanker truck operated by uniformed military personnel. Unfortunately, that fuel proved to be contaminated, and the contaminated fuel shut down those Touro generators that supplied backup power to life safety circuitry on Touro’s seventh floor — the floor that contained SHONO.
Subsequent to the events of August 2005, the plaintiffs filed suit against Touro and amended their original petition several times, eventually naming Aggreko as a defendant. Thereafter, Aggreko filed a cross-claim against Touro, who responded by filing a cross-claim for indemnification against Aggreko. Touro’s basis for liability against Aggreko is an indemnification clause found within the HCPA, which provides in part:
Aggreko shall release, indemnify, defend and hold customer harmless from and against any claim, demand, loss, damage, liability, lawsuit, cause of action, judgment, penalty and/or expense ... on account of property damage or loss, or personal injuries (including illness disability or death) resulting from the operation, use or handling of the equipment or services provided hereunder, to the extent caused by the negligence or fault of Aggreko.
Thus, Aggreko agreed to indemnify and hold Touro harmless for damages incurred by third parties that resulted from the negligence or fault of Aggreko.
LvTouro in its cross-claim pled that Ag-greko breached the HCPA in that it failed to provide the amount of fuel referenced in the HCPA, and it failed to provide a functioning and operable generator. Touro further asserted, among other things, that Aggreko’s alleged breach was the legal and proximate cause of plaintiffs’ damages, and sought indemnification for any sums to which it was cast in judgment in connection with the plaintiffs’ demands.
Aggreko first filed a motion for summary judgment on Touro’s cross-claim on June 2, 2011. The district court subsequently denied Aggreko’s motion, finding that there were “questions of fact surrounding whether the HCPA was breach *1100 ed, and if so, by whom and when.” Aggre-ko sought writs of certiorari with this Court, which denied Aggreko’s request for review. Serou v. Touro Infirmary, 11-1023 (La.App. 4 Cir. 7/25/11 )(unpub.). Aggreko, thereafter, settled with the plaintiffs and re-urged its motion for summary judgment. After trial on the merits of the plaintiffs’ claims, but prior to rendering judgment, the district court granted Ag-greko’s re-urged motion for summary judgment and issued a judgment wherein it: 1) granted Aggreko’s motion for summary judgment against Touro; and 2) found specifically that Touro “failed to establish that Aggreko, LLC’s conduct was the proximate or legal cause of the Plaintiffs’ injuries.”[39] Touro sought review of this ruling within the context of its appeal of the district court’s judgment on the plaintiffs’ demands.
In the district court below, Aggreko argued that summary judgment was warranted because: 1) its own failure to properly perform under the contract was, in essence, excused by Touro’s failure to timely make payment under the terms of |4Rthe contract; and 2) Touro cannot establish that any actions or inactions by Aggre-ko were a legal or proximate cause of the plaintiffs’ injuries. Whatever the merits of Aggreko’s contractual argument, it is clear that the district court granted the motion based upon its finding that Touro cannot meet its burden of proving causation.[40] After reviewing the record and the applicable law, we conclude that the district court erred when it granted Aggreko’s motion for summary judgment and dismissed Touro’s claim for indemnification based upon the presence of genuine issues of material fact within the record before us.
Appellate courts review the granting of summary judgment de novo under the same criteria governing the district court’s consideration of whether summary judgment is appropriate. See Hare v. Paleo Data, Inc., 11-1034, p. 9 (La.App. 4 Cir. 4/4/12), 89 So.3d 380, 387. “A summary judgment may be rendered disposi-tive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of summary judgment does not dispose of the entire case.” La. C.C.P. art. 966 E. “[A] motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.” La. C.C.P. art. 966 C(l). “The burden of proof remains with the movant.” La. C.C.P. art. 966 C(2). “However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of Lsfactual support for one or more elements essential to the adverse party’s claim, action, or defense.” Id. “Thereafter, if the *1101 adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.” Id.
Touro asserts that summary judgment on the issue of causation in its cross-claim against Aggreko was improper because of genuine issues of material fact. We agree. The evidence adduced at trial reveals that the generator delivered by Aggreko to Touro in advance of Hurricane Katrina never worked properly and was completely inoperable within four hours of its activation. Further, it was established at trial that Aggreko failed to provide Touro with a full fuel tank, which led Touro’s staff to accept from a military source fuel that was subsequently found to be contaminated. Similarly, it was eventually discovered that this contaminated fuel led to the shutdown of those Touro generators which were responsible for supplying backup power to SHONO. Likewise, the district court found specifically, within the context of the plaintiffs’ demands, that Touro: 1) had a responsibility to SHONO patients to provide and maintain its premises in a safe and working condition; 2) was contractually obligated to provide emergency backup power and air conditioning to SHONO; 3) failed to provide air conditioning to SHO-NO; and 4) failed to provide SHONO and its patients with a safe environment. Additionally, the district court found that Mr. Serou died as a result of heat-related illness, which was caused in part by the foregoing enumerated failings.
|snHaving reviewed the record, we find that there is a genuine issue of fact as to whether Touro’s inability to provide air conditioning and backup power to SHONO during the aftermath of Hurricane Katrina — failings that the district court connected causally to the plaintiffs’ injuries — resulted, in part, from Aggreko’s failure to provide a functioning backup generator and the contracted-for-amount of generator fuel. Specifically, we find that there is a genuine issue of material fact as to whether Touro personnel would have felt compelled to accept the contaminated fuel — which subsequently rendered inoperative those generators providing backup power to SHONO — had Aggreko provided Touro with the contracted-for-amount of generator fuel. Clearly, with respect to Touro’s and Aggreko’s competing cross-claims, we find that genuine issues of fact remain as to whether Aggreko’s failures to perform under the terms of the HCPA can be causally linked to the plaintiffs’ injuries. Accordingly, we reverse the district court’s judgment that granted Aggreko’s motion for summary judgment on Touro’s cross-claim and remand this matter to the district court. Because we reverse the judgment, those issues raised by Aggreko in its answer to Touro’s appeal are now moot.
DECREE
For the foregoing reasons, the judgment of the district court awarding the plaintiffs wrongful death and survival damages against Touro (the judgment on the principal demand) is affirmed. The judgment of the district court dismissing Touro’s cross-claim against Aggreko (the judgment on the incidental demand) is reversed, and Aggreko’s answer to Touro’s appeal is rendered moot. Touro’s cross-claim is remanded to the district court for proceedings consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED
LEDET, J., dissents with reasons.

. Aggreko is an industrial rental company that specializes in making industrial equipment shelters and generators.

. The Lease includes the following provision regarding cooperation between Touro and SHONO:
c. Regulatory and Administrative Matters. Lessor and Lessee agree to cooperate fully with one another in complying with any and all applicable licensing regulations, safety regulations, health regulations, environmental regulations, and other laws, rules, ordinances or regulations of the State of Louisiana, the federal government or any other applicable authority pertaining to the operation of the hospital facilities maintained by Lessor and Lessee.... Lessor and Lessee shall also cooperate in connection with disaster planning....
The Services Agreement includes an "Administrative Cooperation” provision that requires Touro to "[interface with” SHONO's management. This provision requires Touro to ensure compliance with the Joint Commission of the Accreditation of Hospital Organizations requirements.

. The basis for Touro’s cross claim against Aggreko is the provision in the HCPA for contractual indemnity, which provides:
Aggreko shall release, indemnify, defend, and hold customer harmless from and against any claim, demand, loss, damage, liability, lawsuit, cause of action, judgment, penalty and/or expense (including, but not limited to, attorneys’ fees, court costs and other costs of suit) on account of property damage or loss, or personal injuries (including illness, disability or death) resulting from the operation, use or handling of the equipment or services provided hereunder, to the extent caused by the negligence or fault of Aggreko.

. According to Mr. Serou’s wife, the hospice care Mr. Serou received while in the nursing home was a source of additional services; it was not an indication that he was expected to die soon.

. Dr. Theodore Borgman, Jr., another doctor who treated Mr. Serou, testified that the second sentence in Dr. Langie’s discharge summary — "[t]he patient is usually in very good state of health” — did not make a lot of sense given the line before it. Dr. Langie did not testify at trial.

. A Clinitron bed is a "fluidized air bed,” which means it is "a bed that minimizes pressure and distributes weight evenly over the support surface. A gentle flow of temperature-controlled air is projected upward through numerous tiny openings called ceramic microspheres.” Mosby's Medical Dictionary (8th ed.2009). As Dr. Borgman noted, the purpose of a Clinitron bed is to reduce the pressure that could contribute to the development of further bedsores. Dr. Kevin Jordan, in response to the district court's questions, explained that "because of how the bed works it keeps the patient sort of suspended on an air pillow.... So it actually would allow heat to dissipate more than to hold it into someone.” The district court asked if it the bed would suspend the patient; Dr. Jordan replied, "it's basically a big air mattress, if you will, okay. But the fabric that makes contact to the patient's skin is— it's kind of like a very loosely woven sheet, if you will, very light weight, and the idea is that if someone loses their body fluids, for example, on the bed it can drain away so that you can clean the patient, you can keep them cool or warm them, whatever is necessary much more easily.” Dr. Jordan, however, was unable to opine as to whether a Clinitron bed without electricity, with the material that it’s made of, would potentially contribute to hy-perthermia.

. The record refers to the hospice as “River Ridge Hospice” and "River Region Hospice.” We refer to it as River Region Hospice in this opinion. Dr. Borgman explained that "hospice” is "an appropriate referral for patients when no intervention beyond comfort care is anticipated and death is anticipated in a relatively short period of time.” He defined a relatively short period of time to mean death within a few months at the most. The request to discharge to this particular hospice facility originated from Mr. Serou’s wife.

. As to August 30, Dr. Borgman could not testify for certain that he saw Mr. Serou because there was no note in the chart. Nonetheless, he testified that he saw everybody on his list that day and that it was "very probable" that he saw Serou. He explained that this was the day that he obtained permission to leave the hospital. He further explained that by that time, Touro had begun the process of evacuating the entire hospital, including the SHONO unit, and that charts were hard to come by and patients were spread out in different places. He still further testified that when he left on August 30 there were plenty of physicians to care for the people there. Finally, he testified that Mr. Serou "was alive on the 30.”

. The water supply was lost on August 3 I(the water pressure started decreasing shortly after the hurricane); the power supply was lost on August 29. Frank Folino, Jr., Touro’s vice-president in August 2005, testified that before Hurricane Katrina, Touro had "never had more than a three to six hour power loss” from Entergy, and it had never lost complete water pressure from the S & WB.

. According to Mr. Folino, the "Emergency Chilled Water Loop” plan was implemented around 2002 when Scott Landiy started work at Touro. Before this system was implemented, none of the hospitals had air conditioning when the emergency backup generators were activated. The purpose of this system was to cool some of the areas of the hospital. However, Mr. Folino explained that even after 2002, when "the chiller was hooked up and air conditioning was added, the seventh floor still would not have air conditioning when the back-up generator kicked on.” He further explained that at no time before Hurricane Katrina was air conditioning provided to the SHONO unit when Touro experienced a failure of its outside power source. According to Mr. Landry, SHONO was informed of this fact at some point before Hurricane Katrina in prior safety meetings.

. Another part of Touro's pre-hurricane plan was to break windows for ventilation, if necessary.

. Mr. Landry explained that Touro required a certain level of water pressure from the New Orleans' S & WB for its cooling towers *1077 (not chillers.) It also required the back up generator from Aggreko to run its chillers.

.The purpose of the floor walkers was to identify the needs of any area. Mr. Landry and at least two other Touro employees walked the floors of the hospital during the storm and in its aftermath. Mr. Felino testified that during the aftermath of Katrina, his job included walking the entire building, including the SHONO unit on the seventh floor. He could not recall specifically if any of the SHONO employees asked for anything. He added if they had communicated any need, it would have been provided to them. According to Touro's witnesses, Touro never ran out of food, water, or ice.

. According to Touro, the military fuel was received either Monday, August 28, or Tuesday, August 29.

. At trial, SHONO’s nurse, Sethany Johnson, testified that when the effects of the hurricane were felt by the Touro-SHONO facility, there were sixteen patients alive in the SHONO unit. She testified that initially there were seventeen patients, but "[o]ne had died earlier because of something unrelated.”

. According to Touro's witnesses, however, the backup generator responsible for running the patient’s headboards operated until the time Touro evacuated.

. Mr. Landry was asked about what preparations or plans Touro made to transport the SHONO patients within the hospital to a cooler floor if the environment of care became unbearable; he responded: "[i]f the request would have been made we would have assisted them to move their patients.” Several witnesses testified that they assisted Touro in moving patients around the building. Mr. Folino, however, testified that the movement of patients from upper to lower floors was complicated by the elevator failures. Apparently, water intrusion or flooding of the elevators made them not repairable.

. Hyperthermia is a noun meaning "very high body temperature." P.H. Collin, Dictionary of Medicine, P. 217 (3rd ed.2000).

. The petition, as amended, alleged that Mr. Serou's death was proximately caused by the negligence of Touro, SHONO, or both in the following respects:
1) failing to have a hurricane evacuation plan; failing to implement any kind of protocol, including, but not limited to the ability to maintain their operations in the event of power outages and flooding, failing to implement an evacuation plan and/or failing to evacuate per the warnings provided by the mayor;
2) failing to have and/or to use proper resources to maintain vital, life-sustaining treatment;
3) failing to provide emergency, life-sustaining medical care to its/their patients;
4) breaching the standard of care owed to its/their patients;
5) failure to have suitable facility available for the transfer of patients and/or to have a place to evacuate the patients to in the event of a mandatory evacuation; and
6) any and all other acts of negligence which may be proven at trial.

. The plaintiffs in June 2006 filed a medical review complaint seeking a determination of their malpractice claims against Touro and SHONO. In their complaint, the Serous alleged that Touro and SHONO provided negligent medical treatment to Mr. Serou; particularly, they alleged that:
1) On August 3, 2005, and until his death, Mr. Serou required the use of an IV pump and a Clinitron bed on a daily basis. He also required assistance with eating, bathing, and mobility. In addition to these daily needs, Mr. Serou should have been receiving all life sustaining treatment necessary from Touro Infirmary and/or Specialty Hospital of New Orleans.
2) On August 28, 2005, at approximately 9:30 a.m., the mayor of New Orleans issued a mandatory evacuation of the city of New Orleans due to the approaching hurricane Katrina. Despite this mandatory evacuation notice from the mayor and despite the impending danger of the approaching storm, Touro Infirmary and/or Specialty Hospital of New Orleans failed to evacuate its patients and failed to ensure that it/they had the proper life-sustaining equipment, staff, and resources necessary to ensure the safety of its/their patients in the event of a power failure and/or flood.
3) Mr. Serou died on August 31, 2005. The records from Specialty Hospital of New Orleans indicate that he died as a result of cardiopulmonary arrest due to hy-perthermia.
4) [The plaintiffs] submit that Touro Infirmary and/or Specialty Hospital of New Orleans breached the standard of care owed to Mr. Gordon Serou, Sr. in that these health care facilities failed to have a hurricane evacuation plan, failed to implement any kind of evacuation plan or to evacuate, failed to have and/or to use proper resources to maintain vital, life-sustaining treatment and/or failed to provide emergency, life-sustaining medical care to Mr. Gordon Serou, Sr.
In May 2008, a medical review panel was convened. The panel issued an opinion in May 2008 favorable to Touro and SHONO. The medical review panel in its opinion found that the evidence did not support a finding that either Touro or SHONO failed to meet the applicable standard of care. The panel gave the following four reasons:
1) There was no abandonment by the hospital’s professional staff.
2) Lack of electricity for a Clinitron II bed did not hasten the demise of this patient.
3) While Mayor Nagin did issue a mandatory evacuation order on Sunday morning, August 28, 2005, it is our understanding that this order did not apply to hospitals.
4) The hospital had extra generators brought in, hence responded responsibly. The generators failed when the fuel provided by the military was tainted.

. At the hearing on the motion for summary judgment, the district court, over SHONO's counsel's objection, introduced into evidence a copy of Mr. Latham’s expert report. The district court noted it was admitting the report so that this court could review it.

. The pertinent provision of the Lease Agreement addressing air conditioning provides:
Fixtures and Equipment. Lessor shall be responsible for all maintenance and repairs associated with the heating, ventilation, lighting, plumbing, electrical systems, air conditioning, gas, oxygen (oxygen equipment owned and operated by Lessor), water and sewerage in the leased premises and shall be responsible for the entire cost of repairs and replacement of all such equipment. Lessee shall not remove any fixture or item of equipment affixed to the leased premises without the prior written consent of Lessor.
Paragraph number 9 of the Services Agreement is the pertinent provision of the agreements between the parties that directly addresses "emergency power”:
Emergency Power Supply. Touro shall provide adequate emergency power supply and emergency electrical service to accommodate each patient bed of the leased premises specified in the Lease Agreement in accordance with applicable safety requirements and as customarily maintained in an acute care facility.
Both the Lease and Service Agreement also contain "entire agreement” provisions.

. In its reply brief, Touro points out that, after this appeal was lodged, this court granted Touro's application for supervisory writ in the factually similar case of Falcone v. Touro Infirmary, 12-0464 (La.App. 4 Cir. 4/4/12) (unpub.). The Falcone case involved a claim by the heirs of Mr. Serou's SHONO roommate, who also died in the aftermath of Hurricane Katrina. In Falcone, this court granted Touro's writ and found that the district court erred in granting the Falcone plaintiffs' motion for summary judgment on the issue of whether the “Emergency Power Supply" provision of the Services Agreement between Touro and SHONO obligated Touro to provide air conditioning and emergency power to SHONO. In so doing, this court reasoned that "genuine issues of material fact exist regarding what the words 'adequate,' 'accommodate,' 'applicable,' and ‘customarily’ in the above quoted paragraph 9 mean in the context of the fortuitous events occasioned by Hurricane Katrina and its aftermath. See La. C.C. arts. 1873, et seq.” Touro argues that this court's ruling in Falcone should be applied in this case to determine its duty to the plaintiffs. It further argues that, given the district court’s error in relying on its pretrial ruling, this court should apply a de novo standard of review in this case.

. In its answer, Aggreko asserts the following six assignments of error:
1) The district court erred in failing to specifically rule that Touro breached the Contract, and hence, is not entitled to damages or indemnity.
2) The district court erred in failing to specifically rule that Touro further breached the Contract in “bad faith.”
3) The district court erred in failing to specifically rule that Touro further breached the Contract by failing to notify Aggreko of any problems with the generator.
4) The district court erred in failing to specifically rule that, even if there was a breach on the part of Aggreko, liability is foreclosed because of a "Fortuitous Event” under La. Civ.Code art. 1873.
5) The district court erred in failing to specifically rule that “Payment of a Thing Not Owed” prevents Touro’s recovery, under La. Civ.Code arts. 2298 and 2299.
6) Alternatively, even if indemnity were to become due, the Contract only makes Aggreko potentially liable for indemnity "to the extent caused by the negligence or fault of Aggreko.”

. The gist of Touro’s five assignments of error is as follows: (1) duty — the district court erred in finding Touro had any duty to Mr. Serou other than as its lessee's customer; (2) negligence — the district court erred in failing to find Touro fulfilled or exceeded the standard of care for hurricane preparation; (3) causation — the district court erred in failing to find that medical causation of Mr. Serou's death was not established by competent evidence; (4) allocation of fault — the district court erred in failing to allocate 100% of the fault to SHONO; and (5) excessive quantum — the district court erred in awarding excessive wrongful death and survival damages.

. The line of demarcation between review of a finding that a defendant has a duty — a question of law — as opposed to a finding that the defendant breached that duty — a question of fact — is not always clear. See Kenney v. Cox, 95-0126, p. 1 (La.3/30/95), 652 So.2d 992 (Dennis, J., concurring)(noting that there is a "distinction between the existence of a general duty of care (a legal question) and the 'legal cause’ or ‘duty/risk’ question of the particular duty owed in a particular factual context (a mixed question of law and fact)"); see also Pitre v. Louisiana Tech University, 95-1466, 95-1487, p. 22 (La.5/10/96), 673 So.2d 585, 596 (Lemmon, J., concurring)(noting that "in the usual case where the duty owed depends upon the circumstances of the particular case, analysis of the defendant’s conduct should be done in terms of 'no liability' or 'no breach of duty.' ”)

.The general rule is that a property owner’s duty is to keep its property in a reasonably safe condition, which includes a duty to discover any unreasonably dangerous conditions on the premises and to either correct the condition or warn potential victims of its existence. McCloud v. Housing Authority of New Orleans, 08-0094, p. 3 (La.App. 4 Cir. 6/11/08), 987 So.2d 360, 363; Harris, 455 So.2d at 1369 (framing a property owner’s duty as exercising reasonable care for the safety of the people on its premises and not exposing such people to an unreasonable risks of harm). As Touro points out, a lessor's duty to third parties generally is "found in the ambit of premises defects and not in some obscure negligent leasing theory.” Straughter v. Hodnett, 42,827, 42,870, p. 15 (La.App. 2 Cir. 1/9/08), 975 So.2d 81, 92. In the ambit of premises defects, a lessor’s duty "to protect invitees of his lessee from injuries extends only to injuries from defects or vices in the premises. He is not responsible for the actions or inactions of the lessee.” Sanville v. Archdiocese of New Orleans, 560 So.2d 622, 624—25 (La.App. 4th Cir.1990). We note, *1085 however, that a lessor can assume additional duties. Harris, supra.

. We note that Dr. Borgman similarly testified that "in general, the hospital blended into a single institution in my mind for that period *1086 of time. The separation between Q-7 [SHO-NO], or Q-7 and the rest of it was [lost].”

. As noted elsewhere, the plaintiffs also relied at trial on the pre-trial summary judgment ruling in SHONO's favor that Touro was responsible for providing emergency power and air conditioning. Given our finding that the record supports a requirement of "air conditioning" in the more restrictive sense of the term — movement or filtration of air — we find it unnecessary to address the issue of whether the district court erred in relying on its prior ruling.

. Mr. Latham’s other criticisms of Touro’s hurricane preparation plan included that it was a "cookie-cutter” plan, given that it included a reference to hurricanes as tropical cyclones, and that it failed to include SHONO despite that they shared the same facility and resources in an emergency.

. Mr. Latham defined "special needs” as "those citizens who have special medical needs, whether it be respirators, dialysis, or other health needs that can not be cared for in a general population shelter when we evacuate."

. The plaintiffs’ counsel suggested that because the SHONO unit housed a more vulnerable patient population, Touro should have planned on providing air conditioning for that floor when on emergency power. Particularly, they referred to Dr. Borgman’s testimony that chronically ill people — including Parkinson's patients, the elderly, and people with dementia — are more susceptible to heat exhaustion.

. The record indicates that the exact time of Mr. Serou’s death is undetermined. Dr. Borgman testified that Mr. Serou was definitely alive on August 30, and Dr. Tedesco wrote the note in the chart at 5 p.m. on August 31. Nurse Johnson testified that she could not give an exact time of Mr. Serou’s death.

. Dr. Tedesco admitted that Mr. Serou’s family did not provide him with a HIPPA release form, but that he was nevertheless free to discuss Mr. Serou, Mr. Serou’s medical records, or his purported care of Mr. Serou, as Mr. Serou was not a patient of his while living.

. He also stated at trial that he did not recall it being intolerable on the SHONO unit when he was asked by the SHONO nurses to pronounce Mr. Serou dead. Dr. Tedesco agreed that he would defer to the treating physician, Dr. Borgman, as to the cause of death. Finally, he testified that during the lock down and until the evacuation, he was involved in passing information to Mr. Hirsch and other administrators regarding the conditions of the patients.

. At the beginning of trial, the district court denied the plaintiffs’ request to introduce Dr. Tedesco’s deposition into evidence on the basis that the witness might testify differently at trial.

.Although Dr. Jordan agreed that it would be unusual to have six patients in the same unit die in a three-day period, he added ”[t]hat would be unusual under circumstances of normal functioning, but we were in a situation where this was a never before seen or had emergency.” As to whether it can be stated that it was an environmental factor and not just a coincidence that six people died, Dr. Jordan replied that "I can’t draw that conclusion at all.”

. We note that the same factual allegations formed the basis of the plaintiffs' wrongful death and survival actions. Our finding that there was sufficient evidence of causation applies equally to both claims.

. Trial on Aggreko’s cross-claim against Touro has yet to commence.

. As noted, Aggreko asserts that its failure to perform under the HCPA was excused by its subsequent discovery that Touro was in breach of the HCPA by failing to timely remit payment. Aggreko cites to no law in support of this position, and we decline to craft such a principle. Regardless, our review of the HCPA indicates that Aggreko’s sole remedy in the event of Touro's non-payment was to refuse to perform under the contract. Aggreko, instead, opted to render performance, which Touro claims was deficient and a causative factor in the plaintiffs’ injuries. Moreover, it is clear from the plain wording of the judgment on Aggreko’s motion that the district court granted Aggreko relief after finding that Touro could not meet its burden of proving causation.